UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| JOANNE M. MILLAY, *as parent of minor child YRM*, | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 07-cv-178-B-W |
| | ) | |
| SURRY SCHOOL DEPARTMENT, | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION**

This civil action arises under the Individuals with Disabilities Education Act, 20 U.S.C.

§§ 1400-1487, and presents a petition by the mother of a disabled student who seeks judicial

review of a due process hearing decision presided over by Peter H. Stewart, Esq.  The question is

whether the Surry School Department offered a free appropriate public education to YRM for the

2007-2008 school year.  Although the parties were able to agree about the services that should be

provided in YRM's individualized education program, they could not agree about where the

program would be implemented.  The hearing officer determined that the Surry School

Department "offered" a free appropriate public education to YRM for 2007-2008 based on a

placement proposal that Surry never ordered.  The case is ready for a dispositive ruling on

opposing briefs addressed to the soundness of that decision.  Also at issue is a request by the

Surry School Department that the Court dismiss additional claims asserted by the plaintiff under

the Rehabilitation Act and the Americans with Disabilities Act.  The Court referred the matter

for report and recommendation and I now recommend that the Court overturn the hearing

officer's decision, dismiss the claims under the Rehabilitation Act and the Americans with Disabilities Act, and address the issue of remedy in the context of further proceedings.

## I.   INDIVIDUALS WITH DISABILITIES EDUCATION ACT

The Individuals with Disabilities Education Act (IDEA), is designed to ensure "a free appropriate public education" to children with disabilities, one "that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A) (Supp. 2009). To reach this goal, Congress provides federal funding to the states, provided that they implement specific policies and procedures set forth in the IDEA. See id. § 1412(a) (Supp. 2009). The general prerequisite to a state's receipt of federal funds is the provision of a "free appropriate public education" in the "least restrictive educational environment" to all disabled children residing within the state. Id. §§ 1412(a)(1) & (5).

A free appropriate public education (sometimes referred to as "FAPE") consists of an educational program "that emphasizes special education and related services designed to meet the[] unique needs" of each child, id. § 1400(d)(1), by affording "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability." Id. § 1401(29) (Supp. 2009). By requiring education and related services in the least restrictive environment, Congress sought to ensure that children with disabilities will be educated alongside non-disabled students "[t]o the maximum extent appropriate," so that "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes . . . cannot be achieved satisfactorily." Id. § 1412(a)(5)(A).

Pursuant to the IDEA, the unique needs of each child are to be set forth in an individualized educational program (sometimes referred to as "IEP") developed by a team of individuals, including the child's parents, the child's regular and special education teachers, a qualified representative of the local educational agency, various consulting experts and, where appropriate, the child.  20 U.S.C. § 1414(d) (Supp. 2009).  In Maine, that team is known as the Pupil Evaluation Team (PET).  Mr. I. v. Me. Sch. Admin. Dist. No. 55, 480 F.3d 1, 5 (1st Cir. 2007).  The individual educational program is a written statement that is developed, periodically reviewed (at least annually), and revised by the PET in accordance with specific procedures set forth in the IDEA.  20 U.S.C. § 1414(d)(3) & (4).

As for adequacy of programming, the IDEA "establishes a basic floor of education" for children with disabilities, guaranteeing them "[a] free appropriate public education," id. § 1412(a)(1)(A), but it does not displace the states from their traditional role in setting their own educational policy.  Burlington v. Dep't of Educ., 736 F.2d 773, 788-89 (1st Cir. 1984).  Each state thus remains free to calibrate its own educational standards, provided it does not set them below the minimum level prescribed by the IDEA.  Id. at 788-89.  The IDEA does not mandate provision of a "gold standard" or ideal program.  Rather, a school system is expected only to provide an appropriate public education, one that is "reasonably calculated" to deliver "educational benefits."  Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982).  This assures a "basic floor of opportunity."  Id. at 201.  While there must be meaningful progress for the student, an ideal or optimal educational program need not be provided.  C.G. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 284 (1st Cir. 2008).  Rather, there must be "a reasonable probability of educational benefits with sufficient supportive services at public expense."  G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 948 (1st Cir. 1991) (citing Rowley, 458 U.S. 176, 187-89 (1982)). The purpose of

the IDEA is "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." Rowley, 458 U.S. at 192.

## II.   BACKGROUND

The following background statement is divided into five parts.  Part A provides a general description of the student and her disabilities.  Part B provides a description of important antecedents to the due process hearing, including a description of the Pupil Evaluation Team meetings that preceded the contested placement decision.  Part C provides a description of the due process hearing officer's decision.  Part D provides a timeline for easy reference.  Part E addresses Ms. Millay's commencement of litigation and the amendment of her pleadings.  Part F describes the supplementations made to the administrative record since it was filed in December 2008.

### A.   YRM

YRM was born in November of 1993.  There is no dispute concerning YRM's entitlement to special education benefits.  Ms. Millay adopted YRM from a Nicaraguan orphanage.  YRM is blind and suffers from mild-to-moderate hearing loss.  Although she is not entirely deaf, she is considered to be a deaf-blind student.  In addition to these sensory impairments, YRM is diagnosed as having severe cognitive and neurological impairments and the resulting limitations have been characterized as mental retardation and autism, though the suitability of the autism label is strongly contested by Ms. Millay.  YRM is largely non-verbal[1] and her communication skills are very limited, even within the context of her relationships with special education providers and care providers.  The experience of difficulty in connection with efforts to further

---

[1]      YRM's communication problems can fairly be described as severe.  (See, e.g., Agency Index Vol. VIII at 1416.)  For example, in 2005, her speech objectives were described as demonstrating "intent to communicate" or engaging in "pre-linguistic development activities."  (IEP Goals/Objectives, District's Docs. Vol. I at 87.)

develop communication skills has corresponded with an increase in behaviors injurious to herself.  Similar correspondence exists between changes in programming and self-injurious behaviors.  YRM also has a seizure disorder, although that condition is effectively controlled by medication.

YRM lives with her mother, Ms. Millay, in Surry.  She first enrolled in the Surry Elementary School in 1999.  From 1999 through 2005, YRM participated in a full-day, special education life skills program at the school.  In that time, YRM participated in various activities having a mainstreaming component, including gym, music, art, lunch, recess, and field trips. (Agency Index Vol. VIII at 1505-1512.)

Changes in educational personnel can seriously disrupt programming for YRM.  In the opinion of her longest-term special education teacher, Ms. Hennig, it could take "a couple of months" for a relationship to develop so that educational benefits could be realized.  (Id. at 1503-1504, 1522.)  The predictability and steadiness of YRM's routine at Surry Elementary in these early years had a positive influence on YRM with respect to social skills and behavior.  For example, with her teachers and aides YRM was acquiring skills in an object communication system and could communicate using five or six symbols "that she knew firmly."  (Id. at 1511.) Progress in the area of communication does not come easily and YRM's own frustration with the effort sometimes results in behavioral problems.  In the words of one consultant, her "challenging behaviors should be viewed as a form of communication resulting primarily from a deficit in functional communication skills."  (Dr. Artesani Report, District's Docs. Vol. I at 97.) For a student like YRM, learning consists in fundamentals.  Social skills are of significant importance.  Beyond simple forms of communication, even minimal improvement in social skills like turn taking and sharing are significant.

### B.  Pre-Hearing Background

In the 2004-2005 school year, YRM attended fourth grade at Surry Elementary and her IEP provided 35 hours of weekly instructional services.  YRM's Pupil Evaluation Team became concerned about the implementation of her symbol communication system.  This was of particular concern because tactile systems of communication (symbol boards and, ideally, voice-output boxes) have been viewed as the primary means of increasing YRM's capacity for communication.  YRM's incidents of self-injurious behaviors were increasing in frequency, as were incidents of scratching and pinching directed toward her in-school service providers, possibly due to her own frustration with the symbol communication system.  Based on challenges in implementing YRM's communication programming, the Team revised YRM's goals in this area in April of 2005, away from symbol recognition and toward tactile discrimination.  Additionally, the Team made plans to refer YRM to the Perkins School for the Blind for the 2005-2006 school year, with Ms. Millay's blessing, where YRM could participate in more comprehensive programming that would include a residential component.  (PET Minutes, 4/13/2005, District's Docs. Vol. I at 109.)

#### 1.  *The Perkins placement*

The parties agree that the educational portion of the Perkins placement was a success and that YRM would realize the greatest gains in skills if she were able to participate in the program. (Agency Index Vol. XII at 2296;  Parent's Docs. Vol. I at 111-118, 123;  District's Docs. Vol. I at 215-221.)  However, the placement at Perkins did not take.  Perkins is in Massachusetts and the transition to residential living in an unfamiliar place with unfamiliar care providers caused a significant adjustment reaction, which suppressed YRM's eating and resulted in hospitalization in December 2005.  Following a period of medical assessments in Maine and recuperation at

6

home, YRM was returned to Perkins in March of 2006 in the hope that she might be able to

transition back into the program.  YRM did not respond well to the residential component of the

placement and self-injurious behaviors increased markedly.  Ms. Millay decided to withdraw

YRM from the Perkins program for health reasons after three days.  (Parent's Docs. Vol. I at 129;

see also Me. Dep't of Educ. Compl. Invest. Report ("MDOE Report"), District's Docs. Vol. IV, at

651-55.)

  Ms. Millay maintains that the decision to withdraw YRM from the program was made in

consultation with Perkins staff, who recommended that YRM not remain on account of her

inability to adjust to the demands of residential living.  Ms. Millay does not identify testimony,

documented findings, or written correspondence originating from Perkins personnel that

corroborate this representation.  Ms. Millay alludes to a March 31, 2006, email, "in Perkins

medical notes," but I have not been able to find this document in Ms. Millay's binders based on

this limited reference.  During her testimony before the hearing officer, Ms. Millay stated that

she never received a letter from the Perkins staff in regard to termination of the program.

(Agency Index Vol. X at 2298.)  However, she represented that she had many conversations with

Karen Hearn, director of residential living at Perkins, and with Martha Majors, the dorm

supervisor, and that they agreed it would be "inadvisable to return" YRM to the program.  (Id. at

2300.)  Jeff Jones, YRM's long-time case manager and employee of the Maine Division for the

Blind and Visually Impaired within the Bureau of Rehabilitation, Department of Labor, also

concurred in the decision to remove YRM from the Perkins School.  His testimony at the due

process hearing was to the effect that the decision to remove YRM from Perkins was very

difficult on account of the quality of the programming available there.  His testimony also

corroborates Ms. Millay's representation that Perkins staff shared the opinion that a continued

placement at Perkins was not advisable due to the significance of the adjustment problem associated with residential living. (Agency Index Vol. X at 1816-33.) Ms. Millay also references an office visit note prepared by YRM's neurologist, Dr. Sears, and addressed to YRM's primary care provider. Dr. Sears states in the course of his background summation that YRM's upset at night with self-injurious behavior and sleep deprivation became "such a problem that it did not seem feasible to continue." (Parent's Docs. Vol. I at 220.) Ms. Millay testified that she withdrew YRM because YRM experienced more significant self-inflicted injury during her three-day stay in March of 2006 than anything she experienced in November of 2005. (Agency Index Vol. XII at 2294-96.)

The hearing officer concluded that this evidence did not persuasively demonstrate that YRM could not adapt to a residential placement for 2007-2008. However, for reasons that will follow, I conclude that the Pupil Evaluation Team rejected a Perkins placement during the collaborative process and that Surry never actually ordered a Perkins placement in its Individualized Educational Program for the 2007-2008 school year.

  2.  *The post-Perkins return to Surry Elementary, a programming problem, and the MDOE complaint investigation*

After YRM's removal from the Perkins program, the Pupil Evaluation Team convened on April 24, 2006, and decided that YRM would return to Surry Elementary. Perkins staff participated in the meeting by teleconference and indicated their willingness to provide consultative services to the Pupil Evaluation Team for purposes of developing YRM's Individualized Educational Program. Ms. Majors of Perkins indicated that it was best to make YRM's safety and happiness the number one priority. According to the minutes of the meeting, Ms. Millay expressed the hope that YRM might return to Perkins in the future, perhaps in a

8

couple of years.  The Team discussed objectives and the programming content that would be delivered in Surry, but did not produce a complete Individualized Educational Program at the meeting.  Instead, the focus was on transitioning YRM back to Surry Elementary and reintroducing her to staff.  The idea was that visits would be brief initially, but would increase in duration from day to day.  The minutes do not indicate that there was any discussion about the physical space that Surry would provide for YRM upon her return.  (PET Meeting Minutes, 4/24/06, District's Docs. Vol. II at 251-54.)

YRM returned to Surry Elementary on May 8, 2006, near the end of the school year, and her schooling consisted of one-hour visits through May 16.  Surry failed to make adequate arrangements for space or programming, falling well short even of the program formerly provided at Surry Elementary prior to the Perkins referral.  Essentially, Surry Elementary relegated YRM to a small room where she could be observed by a special education staff member for the one hour that her "program" entailed.  That room could accommodate little or none of her accustomed adaptive equipment.  There was little to no effort to provide social interaction with other students in this timeframe.  YRM's self-injurious behaviors increased significantly.  After May 16, Ms. Millay removed YRM from Surry Elementary, concerned over the self-injurious behaviors and disappointed with Surry's effort at rebuilding a program for YRM.  (MDOE Report, District's Docs. Vol. IV at 660-61.)

Subsequently, Surry agreed to an extended school year (summer) program for YRM. Anita Gilley, a United Cerebral Palsy employee, staffed this four-hour program with the assistance of a college student.[2]  With the elementary school building largely vacant, YRM had

---

[2]      UCP assigned Ms. Gilley to work with YRM after YRM's removal from Surry Elementary in May of 2006. Ms. Gilley was assisted by a music therapist and a speech consultant who worked with YRM on a less frequent basis.  (Agency Index Vol. X at 1986-87.)

more space available to her and, hence, could utilize her adaptive equipment.  With dedicated staffers and an appropriate physical space, YRM's self-injurious behaviors were not so noteworthy.  (Gilley Testimony, Agency Index Vol. X at 1990-92.)  When the 2006-2007 school year began, Surry hired Ms. Gilley as an education technician ("ed-tech") to continue working with YRM.  (Id. at 1992-93;  see also MDOE Report, District's Docs. Vol. IV at 664-66.)

Bobby-Jo Hennig is a special education instructor at Surry Elementary.  Prior to YRM's introduction to the Perkins School, Ms. Hennig was involved in YRM's program at Surry.  Shortly before YRM's move to Perkins, Ms. Hennig and Ms. Millay had a falling out due to a report Ms. Hennig made to the Maine Department of Health and Human Services concerning another child in Ms. Millay's household.  The Department did not find evidence of wrongdoing on the parent's part, but the relationship suffered as a consequence of the reporting activity and other factors.[3]  (MDOE Report ¶¶ 59-60;  see also Ms. Millay's notes to complaint investigators, District's Docs. Vol. III at 427.)  When YRM returned to Surry in 2006, Ms. Hennig was Surry's supervising special education teacher.  However, Surry removed Ms. Hennig from YRM's Pupil Evaluation Team in May of 2006.[4]  (Id. ¶ 65.)  The following fall, in anticipation of the 2006-2007 school year, Surry sought to employ an additional supervising special education teacher to implement YRM's program with Ms. Gilley, and ultimately hired Nancy Sargent, an experienced special education teacher who did not have "up to date" certifications.  (Id. ¶ 66.)

---

[3]      The tense relationship between Ms. Millay and Surry Elementary was noted even at the level of the superintendent's office.  A retired superintendent informed Maine complaint examiners that the school district had been subjected to a "never-ending cycle of complaints" by Ms. Millay made on behalf of several of her children over his 12 years of tenure within the district.  (Me. Dep't of Educ. Compl. Invest. Report at 28, ¶ 63.)

[4]      The school district employs a special education director, Lynn Maddocks.  Ms. Hennig is not the head of the special education program at Surry.

Three significant staffing changes occurred within the district prior to the start of the 2006-2007 school year.  The school district hired a second special education director, Roland Caron, who was designated as being responsible for implementing YRM's program.  In addition, a new principal for Surry Elementary and a new superintendent for the district took over administration.  (Id. ¶ 80.)

YRM's Pupil Evaluation Team did not meet to discuss YRM's Individualized Educational Program or its implementation at Surry for the start of the 2006-2007 school year.  (Id. ¶ 81.) Moreover, Ms. Hennig came to supervise Ms. Gilley's and Ms. Sargent's provision of programming to YRM.  (Id. ¶¶ 82-83.)  Ms. Hennig[5] instructed Ms. Gilley and Ms. Sargent to implement an IEP from 2005 that predated the Perkins program, without consultation with the Pupil Evaluation Team.  (Id. ¶ 84.)  YRM was again relegated to a small room with no other students present, while Ms. Hennig used the larger life skills room to administer programming for two other special education students.  (Id. ¶¶ 89-90.)  Later in September YRM was allowed some access to the life skills room following a September 12 Pupil Evaluation Team meeting. (Id. ¶ 100.)  However, she was denied certain adaptive equipment in that space because of its potential to interfere with other students.  (Id. ¶ 97.)  Throughout September, self-injurious behaviors increased and Ms. Hennig required Ms. Gilley and Ms. Sargent to document the behaviors.  (Gilley Testimony, Agency Index Vol. X at 2017-18, 2020-21.)  The new principal, Elizabeth Ehrlenbach, declined Ms. Millay's requests that she countermand Ms. Hennig and Ms. Millay removed YRM from Surry Elementary on September 22, 2006.

---

[5]     Ms. Hennig became Ms. Bishop in this timeframe.  I continue to refer to her as Ms. Hennig to avoid confusion.

At a September 27, 2006, meeting limited to Ms. Millay and school staff, Ms. Millay expressed disappointment that the Perkins-based Individualized Educational Program was being ignored and requested an alternative placement.  (MDOE Report ¶ 101.)  Mr. Caron stated that Surry was the only public placement available, but that the school district would provide for services in the home, if Ms. Millay preferred.  (PET Meeting Minutes, 9/27/06, District's Docs. Vol. II at 367.)

The parties remained at an impasse through the remainder (*i.e.*, virtually all) of the 2006-2007 school year, and Ms. Millay filed a complaint with the United States Department of Education, Office for Civil Rights.  This resulted in an investigation by attorneys appointed by the Maine Department of Education, who eventually authored the MDOE Report, pursuant to 20-A M.R.S. § 7206.  With the commencement of these proceedings, Surry retained counsel from the Law Firm of Drummond Woodsum & MacMahon to begin managing YRM's case.

In February 2007, the attorneys appointed by the MDOE began investigating Ms. Millay's complaints.  Meanwhile, although the PET was not meeting, Mr. Caron was working to produce a draft Individualized Educational Program for a Pupil Evaluation Team meeting to be scheduled in June, which draft specified a "self-contained program" in "a distraction free environment" due to YRM's "significant needs with behavior."  (District's Docs. Vol. III at 477-78, 515-16.)  For her part, Ms. Millay was arranging for some services in the home (largely through United Cerebral Palsy (UCP)).  She had also filled out student enrollment papers for Mount Desert Island High School (MDI High School), hoping to enroll YRM there for the 2007-2008 school year and possibly for her extended school year program in the summer of 2007.  (PET Meeting Minutes, 6/12/07, District's Docs. Vol. III at 555.)  Surry is not a member of School Union 98, which includes MDI High School.  However, because Surry does not have a

12

high school of its own it contracts for the right to tuition its high school students elsewhere, including at MDI High School.

### 3. *The PET meeting of June 12, 2007*

Among the individuals who attended the June 12, 2007, PET meeting were the principal and a special education teacher from MDI High School, and Kelly Rush Sanborn, the special education director of School Union 98, which includes MDI High School.  Also in attendance by phone were members of the Perkins School staff, including Dr. Mary Talbot-Fox and Ms. Majors.  In addition, counsel appeared for both Surry and Ms. Millay.  (Id. at 552.)  After hearing a description of the Perkins program, Ms. Sanborn asked whether Perkins staff would be available during the summer for consultation and it was noted that Ms. Millay planned on bringing YRM to MDI High School in the fall.  (Id. at 554.)  Ms. Sanborn also directed questions toward other specialists familiar with YRM, evidently considering program development at MDI High School (the minutes note that Ms. Millay intended to register YRM at MDI High School for the 2007-2008 school year and the attendance of MDI High School and Union 98 employees at the meeting supports this conclusion).  (Id.)  Mr. Caron stated that the IEP developed at Perkins would be used "as a starting point for the upcoming year."  (Id. at 555.)  Ms. Sanborn expressed concern that the Perkins program was developed in a residential placement and that placement in a public school would require modifications.  (Id.)  Although Perkins personnel were participating, no suggestion was made of a Perkins placement and no question was directed to Perkins staff concerning the appropriateness of a Perkins placement.  The Pupil Evaluation Team broke up with an agreement to reconvene on June 21 to "discuss" the summer program.

They also agreed to use the Perkins Individualized Educational Program "rather than a draft IEP that was prepared for the meeting."[6]  (Id. at 556.)

### 4.  The PET meeting of June 21, 2007, and the resulting placement decision

The June 21 meeting began with an observation by Surry's attorney, Eric Herlan,[7] that the objective was to "transition" the Perkins program to the format used by the local educational cooperative because the Perkins program was adopted at the June 12 meeting.  (Audio CD of 6/21/2007 PET meeting, disc 1[8], track 1, 2:10-2:29 min, track 2, 4:00-4:17.)  Early in the meeting, Attorney Herlan proposed placement at Perkins itself based on YRM's programming needs, including high staffing needs and what he regarded as a need for an extended school day program.  (Id., track 4, 1:00-2:47.)  No members of the Perkins staff were in attendance at the meeting to address this proposal.  Ms. Millay opposed the proposal based on YRM's prior adjustment reaction to residential placement and Mr. Jones reported that the opinion Ms. Majors (of Perkins) had expressed to him was that a placement at Perkins was not likely to succeed given the past experience.  (Id., track 4, 2:48-track 5, 2:50.)  At the conclusion of the meeting, Surry issued an Individualized Education Program stating that "[d]ue to her significant needs with behavior, [YRM] requires specialized instruction and a distraction free environment," and that YRM "requires placement in a day treatment program such as Stillwater Academy." (District's Docs. Vol. III at 562 (emphasis supplied).)  For the extended school year program, Surry specified a placement at Surry Elementary.  (Id. at 564.)  Attorney Herlan indicated that

---

[6]       I.E., Mr. Caron's draft Individualized Educational Program that called for a "self-contained program" in "a distraction free environment" due to YRM's "significant needs with behavior."

[7]       One of Attorney Herlan's partners, James Schwellenbach, attended the June 12 meeting and served as the "facilitator" of the meeting, a role that Attorney Herlan assumed as of the June 21 meeting.  (6/12/07 PET Meeting Minutes, District's Docs. Vol. III at 553.)

[8]       The first disk in this set is mislabeled as recording a June 27 meeting, rather than a June 21 meeting.

the matter of the appropriate behavior support guidelines could be readdressed in the fall "after a placement has been confirmed."  (Id. at 574.)

At the June 21 meeting, Mr. Herlan solicited comments from Dr. Nancy Godfrey, a deaf/blind consultant not associated with the Perkins School whom Surry brought in as a consultant and who first visited some area facilities and first observed YRM "briefly," sometime between the June 12 and June 21 PET meetings.  Dr. Godfrey opined that YRM could not receive a full Perkins program in a public school setting, to which Ms. Millay agreed.  Ms. Millay indicated that delivery of the ideal program (like the Perkins program) was not necessary, but that an appropriate program could be provided in the public school setting.[9]  (Audio CD of 6/21/2007 PET meeting, disc 1, track 5, 3:00-track 6, 0:51.)  Dr. Godfrey observed that it was not her decision to determine whether local public schools could provide such a program,[10] but reported that she had visited two area programs:  Kids Peace and Stillwater Academy.  As for Kids Peace, Dr. Godfrey expressed the view that it was not an appropriate placement.  However, she opined that Stillwater Academy could provide a more appropriate program and that its staff were likely to have skills related to more of YRM's multiple needs (without ever saying that the public school system could not make appropriate and adequate arrangements).  (Id., track 6, 1:18-3:08.)  As for Stillwater Academy, Dr. Godfrey visited that facility in the summer, when

---

[9]      Ms. Millay requested that Ms. Godfrey become the macro-manager of YRM's program to oversee program development within a public school setting.  (Disc 2, track 9, 0:00-1:32.)

[10]      In a report signed on the same date as the June 21, 2007, PET meeting, Ms. Godfrey wrote:

   This consultant does not propose to know the detailed capacities or capabilities of the Maine School Administrative District/School Union 92 Special Education personnel or its contractual resources to provide this student with the specialized supplementary assistance to address her educational needs.  However, piecing together separate entities of specialties and programming is not the optimal educational protocol for someone with multiple disabilities.

(Consultation Report, June 21, 2007, District's Docs. Vol. III at 581.)

classes were not in session, and she did not have an opportunity to observe what the students were like.  She indicated that she had a conversation with a solitary employee at the school.  (Id., track 7, 0:20-0:34.)  Later in the meeting, Dr. Godfrey reiterated her primary point, which was that there should be a "holistic approach," where services like speech therapy, OT, and PT could be implemented throughout the day by qualified staff.  (Id., disc 2, track 12, 0:40-1:02.)  Surry's minutes from the meeting indicate that Dr. Godfrey expressed the view that "Stillwater Academy could be able to put together a program."  (PET Meeting Minutes, 6/21/07, District's Docs. Vol. III at 574.)

During the meeting Ms. Sanborn and Roberta Raymond expressed their view that MDI High School would not be an appropriate placement given YRM's needs.  Ms. Sanborn also indicated that she did not have enough information in the way of current evaluations to understand how a program appropriately structured for YRM would "fit" with the life skills program then in place at MDI High School.  (Audio CD of 6/21/07 PET Meeting, disc 1, track 11, 1:40-3:08.)  Ms. Millay objected to Ms. Sanborn's notion that YRM should have to "fit" into a preexisting program, indicating that the obligation of the public school was to devise a program to fit YRM.  (Id., track 12, 0:11-0:45.)  Mr. Herlan then expressed the view that YRM's needs are "too extensive to be addressed in any public school program we know and they perhaps could be addressed at Stillwater Academy and, but for the medical issue, . . . could be addressed at . . . Perkins."  (Id., track 12, 0:45-1:01.)  Consultant Godfrey expressed concern whether a public school program could provide the kind of "wrap around, comprehensive interventions" that YRM would need from day to day.  (Id., disc 2, track 1, 4:40-4:58.)

The team discussed the time needed for a deaf/blind/psych consultant to "macro-manage" development of YRM's ESY program, conduct evaluations, and train and consult with staff on

16

programming issues.  The consensus was that a consultant would have a relatively "heavy" role initially, tapering off as the program gained momentum, with the hope that gains made in a summer program would carry over with staff transitioning to the school-year placement.  (Id., Disc 2, track 13, 2:20-track 14, 1:16.)  Mr. Herlan noted that it was unlikely to happen that Surry would be able to find a qualified person to put in that level of effort, unless Ms. Godfrey were available to assume that responsibility.  (Id., 1:16-2:30.)

The issue of summer placement at Surry resurfaced and Ms. Millay expressed acceptance that such a placement would suffice, but also expressed the desire that MDI High School be involved to some degree to facilitate a transition to MDI High School, possibly by hiring the ed-techs who would administer YRM's summer program.  (Id., track 14, 4:14-28.)  Ms. Sanborn indicated that Surry would have to hire the ed-techs and that MDI High School would have its own hiring process if it came to that, reiterating that she had no evaluative information upon which to structure an appropriate program at MDI High School.  (Id., 4:28-4:46.)  Ms. Sanborn stated that "if the intention is to . . . place her at the high school and if we feel that we can program for her, I certainly would have staff . . . coming to visit that program."[11]  (Id., track 14, 4:46-track 15, 0:06.)  Shortly after this discussion, the PET meeting ended.[12]  The minutes conclude with the entry:  "Without consensus, the decision was made for a day treatment placement for 2007-2008 school year, decision to be reviewed before the start of the school year." (District's Docs. Vol. III at 576.)

---

[11]     The need for a summer transitional program was discussed at some length earlier in the meeting.  Linda Mosley, a United Cerebral Palsy day habilitation coordinator, and Ms. Hennig agreed that staffing decisions would need to take place over the summer in order for YRM's educational program to make any headway at the start of the school year.  (Audio CD of 6/21/2007 PET meeting, disc 2, track 3, 0:30-1:00 & track 4, 4:45-track 6, 0:30.)

[12]     There is a third audio CD labeled as containing content from the June 21, 2007, meeting.  The third CD is blank.

As Ms. Millay states in her memorandum of law (Doc. No. 115 at 18), there was no information provided during the meeting whatsoever about the Stillwater program (or the Kids Peace program), other than Ms. Godfrey's personal assessment that Kids Peace was not appropriate and her *ipse dixit* that Stillwater could provide a suitable program based on her conversation with one solitary employee of the institution.  In a Parental Notice of Proposed Special Education Change of Program form prepared following the meeting but not mailed until August 15, 2007, Mr. Herlan informed Ms. Millay that her requested MDI High School placement was "rejected because not sufficiently structured."  (District's Docs. Vol. III at 589.)

### 5.  The MDOE Complaint Investigation Report

On July 11, 2007, the attorneys appointed by the MDOE to investigate Ms. Millay's complaints issued their report.  They concluded that Surry committed numerous and serious IDEA violations in the spring and summer of 2006 and extending into the 2006-2007 school year.  (MDOE Report, Part VI Conclusions, District's Docs. Vol. IV at 677-699.)  Among other relief, they ordered a corrective action plan that required Surry to implement the Perkins-styled program beginning in the summer of 2007 and ordered that the Pupil Evaluation Team further develop YRM's Individualized Educational Program and determine a 2007-2008 school year placement with input from professionals at the Perkins School and other professionals with knowledge of YRM and her needs.  (Id. at 699-700.)  Among other instructions provided in the Report, Surry was directed to develop an Individualized Educational Program "in accordance with the regulations for least restrictive environment" and cautioned to make future Individualized Educational Program decisions only with proper input from qualified professionals.  (Id. at 699.)

18

6.   *The August 23, 2007, PET meeting*

The Pupil Evaluation Team reconvened August 23, 2007, for its last meeting prior to the start of the school year.  The record does not contain an audio recording.  Surry maintains that its audio equipment failed to work.  The meeting minutes state that Ms. Millay recorded the meeting with her own tape recorder, but there are no tapes in the record and Ms. Millay sought to obtain a copy of Surry's recording during the discovery associated with the due process hearing.  What the paper record reflects is that YRM did not participate in the Surry ESY program, but, rather, in a United Cerebral Palsy summer program based from her home.[13]  (PET Meeting Minutes, 8/23/07, District's Docs. Vol. IV at 792.)  In any event, it is apparent that Dr. Godfrey was no longer serving as a consultant on the case in August 2007 as there is no evidence that she assisted in the development or preparation of a plan to implement YRM's Individualized Educational Program in any particular placement or that she followed up on her investigation into the suitability of Stillwater Academy as a placement for YRM.

The minutes of the August meeting suggest a rather perfunctory affair.  Despite the fact that the minutes of the June meeting indicate a placement at Stillwater Academy, the minutes of the August meeting indicate the following:  "The Team returned to the issue of placement.  Surry reiterated that it believed a day treatment placement was appropriate.  Stillwater Academy is not available until November, but Kid's Peace in Ellsworth has said they could serve her."  (Id. at 793.)  This second-hand reporting about Stillwater Academy and Kids Peace reflects that the August Pupil Evaluation Team meeting did not include any input from these proposed service

---

[13]     The Hearing Officer found that the June 21, 2007, PET meeting resulted in an agreement on the content of an ESY program to be implemented at Surry Elementary, but that Ms. Millay did not allow YRM to participate because of problems at the onset of the program.  The hearing officer found that the start-up problems were "relatively minor" and "swiftly remedied" by Surry.  (Hr'g Officer's Docs. at 421-22.)

providers, let alone any data about staffing or space commitments for YRM's proposed day treatment placement.

Ms. Sanborn, the director of Union 98, was present at the August meeting and indicated that YRM required a day treatment placement with a provider that could supply "psychological intervention on site."  (Id.)  According to the minutes, "[s]he felt Kid's Peace's new autism program was appropriate for [YRM.]"  (Id.)  From the minutes it is evident that Surry's approach was that it "would advertise for a skilled special education teacher and educational technician to be part of [YRM's] program at Kid's Peace," where staff would develop a behavioral program over an unspecified period so that YRM might eventually "transfer to a public high school," with the new staff transitioning along with her.  The meeting closed with Mr. Caron stating that YRM's placement "would be day treatment" and that "[a]t this time, the location would be Kid's Peace since Stillwater Academy is not available until November."  (Id.)  None of the meetings throughout the summer included any presentation concerning any specific staff member at either Kids Peace or Stillwater Academy whose professional skills were deemed capable of providing or facilitating "wrap around" services, "comprehensive intervention" services, or on-site "psychological intervention" services, which were given as explanations for why a placement in the public school setting would be inappropriate for YRM.  The IEP that emerged in August specified outside experts to provide consultative services, just as it would have if the placement had consisted of a public school placement.  (Id. at 803-804.)  With respect to placement itself, the August IEP specifies the location for special education services simply as "day treatment program," without expressing commitment to either of the identified day treatment locations.  (Id. at 803.)

20

### 7.   A false start at federal litigation

On August 31, 2007, Ms. Millay commenced a civil action in this Court against School Union 92, which includes the Surry School District, seeking, among other relief, a preliminary injunction ordering placement at MDI High School as the appropriate, least-restrictive public educational placement.  That proceeding was dismissed in October 2007, on Ms. Millay's motion, to allow for an administrative due process hearing to transpire.

### C.  The Hearing Officer's Decision

Ms. Millay sought an administrative due process hearing from the MDOE on November 21, 2007.  Ms. Millay stated two reasons for her hearing request.  First, she maintained that Surry failed to comply with the requirements of the corrective action plan and denied a free appropriate public education to YRM during the related time period.  (Hr'g Officer's Docs. at 83.)  Second, she complained that Surry "failed to provide an educational program for [YRM] since the date of that decision" (the July 11, 2007, MDOE Report.  (Id. at 84.)  Surry filed its own request for an administrative hearing on November 30, 2007, stating the issues as (1) whether the 2007 ESY (summer) program offer was appropriate and (2) whether the 2007-2008 Individualized Educational Program placement offers were appropriate, while also recognizing that Ms. Millay's request included additional issues.  (Id. at 128.)  Thereafter, on a motion to dismiss, the assigned hearing officer, Peter H. Stewart, Esq., dismissed the issue of whether Surry had complied with the MDOE Report, ruling "that a due process hearing is not the appropriate forum in which to seek enforcement of such a corrective action plan."  (Hr'g Officer's Docs. at 413.)[14]

---

[14]      In a missive sent July 11, 2007, Commissioner of Education Susan Gendron indicated that a failure to comply with the Complaint Investigation Report could result in referral of the matter to the Maine Attorney General. (Agency Index Vol. I at 11.)  This administrative enforcement scheme is distinct from the administrative exhaustion requirements of the IDEA.

The due process hearing commenced in January of 2008 and the hearing officer issued his decision on June 20, 2008.  The hearing officer framed the issues as (1) whether the 2007 extended school year summer program was appropriate and (2) whether the 2007-2008 Individualized Educational Program developed by Surry "could be implemented appropriately in the Surry Elementary School or in any of the other placements offered by the school."  (Id. at 414.)  This framework proceeded from the premise that the services called for in the Individualized Educational Program were not objectionable and that the only dispute was over the appropriate placement.  (Id. n.4.)  As for the first question, the hearing officer concluded that Ms. Millay unjustifiably refused to let YRM participate in the Surry-based summer program because of "relatively minor" problems getting the program started, including a staff training issue, and the hearing officer otherwise found that the summer program was reasonably designed to maintain YRM's existing abilities.  (Id. at 421-22 & nn.5-7.)  As for the 2007-2008 school year, the hearing officer concluded that the *offer* of placement at Perkins was an appropriate placement *decision*.  The hearing officer did not make any findings concerning the appropriateness of ordering placement at Kids Peace.  Instead, he found that an adequate school program simply could not be developed for YRM in a public school setting in Hancock County and that Surry's "offer" to send YRM back to Perkins was an appropriate placement because it offered the best possible placement.  (Id. at 430-31 & n.19.)

On the question of whether a residential placement at Perkins would work for YRM medically and emotionally, the hearing officer essentially found that YRM's past failure to adapt to the residential component of the Perkins program was due to Ms. Millay's failure to leave YRM at Perkins for a protracted initial stay in 2005, preventing YRM from making a clean break from the home environment.  Despite the overwhelming evidence that YRM is not a typical

22

child, the hearing officer reasoned that a new attempt at a Perkins placement might succeed because "[a]ll of us who have raised children know that there is a world of difference between an 11 year old and a 14 1/2 year old," believing that YRM may now be mature enough to handle a residential program.  (<u>Id.</u> at 432-33.)  The hearing officer also found that there was "no persuasive evidence presented as to the student's *inability* to be successful in the residential living situation," and observed that Ms. Millay should have called witnesses from the Perkins program to address that very issue.  (<u>Id.</u> at 433, emphasis added.)  Given this conclusion, the hearing officer found that "no remedial order need be issued."  (<u>Id.</u>)  The hearing officer issued his decision on June 20, 2008.

### D.  A Timeline

For ease of reference, the following timeline collects important dates in the development of this dispute.

*2005*

| | |
|---|---|
| Dec. 2005 | YRM hospitalized during Perkins placement |

*2006*

| | |
|---|---|
| March 2006 | Return to Perkins ended after 3 days |
| April 24, 2006 | PET meeting to address transition back to Surry Elementary |
| May 8, 2006 | YRM returned to Surry Elementary |
| May 16, 2006 | Ms. Millay removed YRM from Surry Elementary based on lack of both programming and adequate space |
| Summer 2006 | UCP/home based summer program |
| School starts 2006 | Surry hired Ms. Gilley to be YRM's teacher and hired Ms. Sargent to assist. |
| | Mr. Caron hired as special education director for Surry. |

23

|            | PET failed to meet prior to school year to establish program for start of school year. |
|------------|----------------------------------------------------------------------------------------|
|            | Ms. Hennig administered a program drawn from YRM's pre-Perkins IEP.  YRM's self-injurious behaviors escalated. |
| Sept. 2006 | Ms. Millay removed YRM from Surry Elementary. |

<em>2007</em>

| Feb. 2007 | Ms. Millay filed her complaint with MDOE |
|-----------|------------------------------------------|
| June 12, 2007 | PET meeting—IEP from Perkins chosen as starting point for new IEP |
| June 21, 2007 | PET meeting—Surry ordered "day treatment" placement |
| July 6, 2007 | MDOE investigators issued their Complaint Investigation Report |
| July 11, 2007 | Commissioner Gendron adopted the Complaint Investigation Report as final and binding |
| Summer ESY | YRM at home doing UCP/Millay program, Ms. Millay having rejected Surry's summer program |
| Aug. 23, 2007 | PET meeting:  "At this time, the location would be Kid's Peace since Stillwater Academy is not available until November." |
| Aug 31, 2007 | Ms. Millay filed abortive civil action in this Court |
| Nov. 21, 2007 | Ms. Millay filed her due process complaint |
| Nov. 27, 2007 | Ms. Millay filed the instant civil action |
| Jan. 2008 | Due process hearing conducted |
| June 20, 2008 | Hearing Officer issued decision under review |

**E.  This litigation**

Ms. Millay recommenced litigation on November 27, 2007, while the administrative

hearing process remained unresolved, seeking a "stay put" order to implement the placement of

24

her choice.  Ms. Millay named School Union 92 as the only defendant.  After a delay in decision

by this court on the "stay put" issue, the hearing process ran its course, and this Court ruled on

October 28, 2008, that the appropriate stay put placement was at Surry Elementary and that

Surry must fully implement the Individualized Educational Program last implemented at Perkins

School for the Blind, reasoning that the status quo as of the November filing was the placement

ordered by MDOE in its July 2007 Complaint Investigation Report.  (Order on Pending Mots. at

1, 3, 19-20, Doc. No. 53.)  Meanwhile, the Court permitted Ms. Millay to amend her initial

pleading for injunctive relief to name the Surry School Department as the defendant, in place of

School Union 92, and to include a claim for judicial review of the hearing officer's

administrative decision and two additional claims of disability discrimination.  (See Doc. Nos. 35

& 43-46;  see also Order on Pending Mots. at 6-9.)  The complaint now recites four counts: (1)

the stay put request already addressed by the Court[15];  (2) a claim for judicial review under the

IDEA;  (3) a claim of disability discrimination under section 504 of the Rehabilitation Act;  and

(4) a claim of disability discrimination under the Americans with Disabilities Act.  (Am. Compl.,

Doc. No. 44.)

### F.  The Administrative Record and its Supplementation

The parties have submitted the administrative record required for determination of Count

II.  This record has been supplemented in certain limited respects.  The District's initial motion to

supplement sought to introduce records pertaining to Pupil Evaluation Team meetings occurring

after the hearing officer issued his decision, related primarily to development of an

Individualized Educational Program for the 2008-2009 school year, and offered in the event that

---

[15]      The Court denied the preliminary injunctive relief requested by Ms. Millay to the extent her request fell
outside the parameters of a proper stay put order under the IDEA.  (Order on Pending Mots. at 20-25.)

the Court decides to reject the hearing officer's decision and might desire to review such documents to consider the District's degree of compliance with the stay put order or for other reasons related to the creation of an equitable remedy.  (Def.'s Mot. to Supplement at 2-3, Doc. No. 66.)  I granted the request, thereby admitting into the record some 218 pages of paper records located on the docket at entry 67, for the provisional purpose of fashioning a remedy for YRM, should it come to that.  (Id. at 4-5.)  Ms. Millay also sought to supplement the record with eight categories of documents and testimony from herself and other individuals.  (Id. at 2-3.)  I granted this request in part, admitting Ms. Millay's personal declaration and affidavit (Doc. No. 66-1), letters from her physicians (Doc. No. 66-2), letters from Kysha Woodye, a United Cerebral Palsy caseworker assigned to YRM, and Elesia Moore, a UCP case manager, and from Jeff Jones (Doc. No. 66-3), correspondence among Ms. Millay and the Special Education Director for the District and School Union 92 and Attorney Herlan concerning a December 2008 PET meeting (Doc. No. 66-4), and correspondence from Perkins Admissions, stating that Perkins declined admission to YRM for the 2008-2009 school year (Doc. No. 66-8), but otherwise denied Ms. Millay's request to supplement the record (Doc. Nos. 66-5, 66-6, 66-7).  (Order on Mots. to Supplement at 3, 5-6.)  The Court overruled Ms. Millay's objection to the partial denial of her request to supplement the record.  (Doc. No. 82.)  Like the documents admitted at the District's request, Ms. Millay's supplemental documents are meant to be available in the event they may prove relevant and helpful to any award of equitable relief.[16]

In May of 2009 Ms. Millay sought to supplement the record once again.  This request concerned a new discovery by Ms. Millay related to the contents of files maintained at Kids

---

[16]      There is presently another proceeding in this Court arising from YRM's Individualized Educational Program and placement for the 2008-2009 school year and the related administrative hearing decision issued on June 4, 2009 (Case No. 1:09-cv-411).  Mediation efforts in 2009 resulted in a placement at Bangor High School for the 2009-2010 school year.  (See May 18, 2009, Status Report, Doc. No. 100.)

Peace.  The request was granted in part to admit an April 20, 2009, e-mail authored by Jean

Dickson of Kids Peace stating that the only contents of their file for YRM amounted to copies of

minutes from PET meetings (Doc. No. 90-2).  In the course of addressing this issue, the Surry

School District's counsel offered a stipulation that it never filed a written application for YRM to

attend Kids Peace.  (Order on Mot. for Correction, Doc. No. 102.)

On July 23, 2009, during the briefing cycle, the Surry School District filed a motion to

supplement the record to include the hearing officer decision issued in June 2009 concerning the

2008-2009 Individualized Educational Program and placement.  Like its earlier motion to

supplement, the new material was offered as relevant on issues of remedy.  (Mot. to Supplement,

Doc. No. 118.)  On August 18, 2009, I denied the request, without prejudice to Surry's right to

renew the motion in the event the Court should determine that the hearing officer's decision was

erroneous and address the issue of remedy.  (Doc. No. 124.)

On August 24, 2009, Ms. Millay sought to supplement the record to show the success of

YRM's new public program at Bangor High.  (Doc. No. 125).  I denied the request, with the

observation that the Court might well revisit the issue in the event this litigation should result in

equitable relief.  (Doc. No. 128.)

## III.  IDEA DISCUSSION

In her complaint, Ms. Millay seeks relief under the IDEA for alleged violations extending

back as early as May 2006.  (Am. Compl. ¶ 7.)  The hearing officer refused to address matters

occurring prior to summer 2007 in the context of the due process hearing.  Part A of this

discussion explains why this determination was erroneous and why Ms. Millay's relief under the

IDEA should extend back to Spring 2006.  As for the matters actually addressed by the hearing

officer, it is not the content of the Individualized Educational Program that is at issue, but the

decision on where that program would be implemented.  Although it cannot be said that the Individualized Educational Program failed to contain, on paper, a program individually structured to account for YRM's individual needs, the placement dispute nevertheless raises concerns in regard to (1) least restrictive environment;  (2) reasonable likelihood of educational benefit;  and (3) the existence of some substantive information or data, addressed by the PET, in support of the decision in question.  Placement is a component of any prescribed program and there is no avoiding these issues by suggesting that the "content" of the IEP is not in dispute. The applicable standards are described in Part B of this discussion, along with the standards that apply with respect to burdens of persuasion before the hearing officer and before the court on judicial review.  Part C explains why the hearing officer's decision was erroneous and recommends further proceedings to address the issue of remedy.

### A.  The Scope of Judicial Review in this Action

The IDEA places a two-year limitation period on requests for due process hearings.  20 U.S.C. § 1415(b)(6)(B) & (f)(3)(C).  Ms. Millay filed her request for a due process hearing on November 21, 2007, which entitled her to request a hearing reaching back to November 21, 2005.  The hearing officer construed Ms. Millay's request under the IDEA as being limited to the 2007 summer ESY program and the 2007-2008 school year placement.  Although Ms. Millay's request plainly raised a challenge to programming decisions occurring as early as spring 2006, the hearing officer dismissed this portion of her due process hearing request by characterizing the request exclusively as an effort to enforce the Complaint Investigation Report.  This was an ungenerous reading of the hearing request form.  Although Ms. Millay may have sought relief tied to the findings of the Complaint Investigation Report, her hearing request clearly relates a request to be heard on the denial of a free appropriate public education "during the time period

covered by" the complaint that launched the MDOE investigation.  (Hr'g Officer's Docs. at 83 ¶ 1.)  That complaint and the related investigation addressed three time periods:  spring 2006, summer 2006, and fall 2006 through July 2007.  (MDOE Report, District's Docs. Vol. IV, at 677.)[17]

The IDEA does not withhold a right to a due process hearing whenever the parent has pursued an alternative administrative enforcement proceeding under state law.  At least, the IDEA itself contains no such qualifications and I have been unable to find any decisional authority to that effect.  In an analogous situation, the First Circuit has held that a parent may seek judicial relief under the IDEA even if she has succeeded before a hearing officer on administrative proceedings.  Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 116 (1st Cir. 2003). Although the administrative proceedings at issue in Nieves-Marquez were proceedings under the IDEA, there is no sound reason why Ms. Millay's utilization of the complaint process afforded to her under 20-A M.R.S. § 7206 should compromise her ability to seek identical or complementary relief under federal law.  Strong cautionary language in Nieves-Marquez persuasively explains why such a ruling would be ill-advised.

It cannot be that a court is powerless under IDEA to issue injunctive relief when the school system neither appeals from nor complies with a valid administrative order and its continuing obligations.  That would open a gaping hole in IDEA's coverage.  It would create incentives for school systems to drag out the

---

[17]  In the motion submitted to the hearing officer seeking dismissal of this portion of the IDEA hearing request, Surry acknowledged that the complaint resulted in final agency action that was not appealed by either party. (Hr'g Officer's Docs. at 119.)  Surry argued that, because alternative avenues of enforcement were available under Maine law, Ms. Millay could not ask the hearing officer to issue an order designed to enforce the terms of the complaint investigation report.  (Id. at 120.)  The hearing officer embraced this reasoning.  (Id. at 122.)  Although the hearing officer was correct that his task was not "to enforce" the complaint investigation report, that does not mean that he could not afford Ms. Millay a hearing under the IDEA on her contention that Surry denied a free appropriate public education to YRM during the time periods addressed by the report.  Certainly Surry failed to cite authority to that effect.  The hearing officer should have included these time periods within the scope of the due process proceedings and directed Surry to address the question of whether it could object to final agency findings on factual matters contained in a report, adopted by the MDOE, and never appealed by Surry.

administrative process, not to appeal administrative orders, not to announce their
intentions to refuse to comply with those orders, and generally not to comply.

Nieves-Marquez, 353 F.3d at 116.

Ms. Millay's request for a due process hearing included an assertion that Surry had denied
a free appropriate public education to YRM in spring 2006, summer 2006, and fall 2006 through
July 2007.  The hearing officer erred when he ruled that he could not provide Ms. Millay with a
hearing related to the provision of a free appropriate public education during these time periods
simply because Ms. Millay also stated that Surry had failed to comply with the corrective action
plan specified in the Complaint Investigation Report.  Ms. Millay is entitled to pursue a remedy
under the IDEA for any violations extending back to spring of 2006.  The parties should be heard
on how to proceed with this issue.  Surry has never appealed the final report of the MDOE,
which could supply suitable factual findings for this Court to incorporate into its final order.
Indeed, the MDOE has final administrative oversight when it comes to the provision of special
education services by Maine schools, 20-A M.R.S. § 7204, and the Commissioner of Education
is obligated to ensure compliance with the IDEA in order to safeguard Maine's receipt of federal
special education funds, 20 U.S.C. §§ 1407, 1412.  The Commissioner has ruled that the
Complaint Investigation Report is "final and binding."  (District's Docs. Vol. IV at 634.)

As the Court noted in its prior discussion of the stay put issue, the Complaint Resolution
Procedure found in 20-A M.R.S. § 7206 is an alternative mechanism that a state can utilize to
ensure that local school units are complying with the IDEA.  Millay v. Surry Sch. Dep't, 584 F.
Supp. 2d 219, 231 (D. Me. 2008).  Although the Complaint Resolution Procedure does not offer
the parties all of the protections available in a due process hearing, id. at 231, the Court has
found that a decision arising from a Complaint Resolution Procedure is sufficient to bind the

local school unit for purposes of injunctive relief under the IDEA's stay put provision, id. at 232-33.  If there is some impediment in administrative law that would preclude the MDOE's "final and binding" decision in the Report from binding Surry to the factual findings it contains, Surry should nevertheless be bound under the circumstances of this case, where it was Surry itself that sought the dismissal of matters concerning alleged violations in 2006 and early 2007.  Surry voluntarily waived its right to be heard on those matters by seeking the dismissal of Ms. Millay's request that the hearing officer hear and consider those matters.  I recommend that the Court accept the factual findings of the MDOE and consider them for purposes of fashioning an equitable remedy under the IDEA.  Alternatively, I recommend that the Court order Surry to show cause why it should not be bound by the factual findings contained in the Complaint Investigation Report.

### B.  The Applicable IDEA Standards

#### 1.  Least restrictive environment (LRE)

Pursuant to the IDEA:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).  Generally speaking:  "The least restrictive environment is the one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled."  Carlise Area Sch. v. Scott P., 62 F.3d 520, 535 (3d Cir. 1995).

"Mainstreaming may not be ignored, even to fulfill substantive educational criteria."  Roland M.
v. Concord Sch. Comm., 910 F.2d 983, 992-93 (1st Cir. 1990).

Although a school district may place a student in a program that it does not administer, it
remains responsible for ensuring that the standards of the IDEA are met in that program.  20
U.S.C. § 1412(a)(10)(B)(i) & (ii);  34 C.F.R. § 104.33(b)(3).  When it comes to residential
placements, however, it is a particular concern that such a placement be necessary for
educational benefit in order to override the least restrictive environment counterweight.  34
C.F.R. §§ 104.33(c)(3), 300.104, 300.704(c)(4)(ii).  This necessity standard usually cuts in favor
of a school district opposed to a family's preferred placement in a costly residential program, but
there is no good reason why it cannot serve a parent resisting a private placement far from home.
Because the IDEA "manifests a preference for mainstreaming disabled children," the objective
"is to find the least restrictive educational environment that will accommodate the child's
legitimate needs."  Five Town, 513 F.3d at 285.  "A student's IEP should be targeted to achieve
the child's education in the least restrictive setting."  Greenbush Sch. Comm. v. Mr. K., 949 F.
Supp. 934, 939 (D. Me. 1996).

The U.S. Department of Education's analysis of its regulations indicates that a child
should be placed as close to home as possible, assuming such a placement is desired by the
family:

> Among the factors to be considered in placing a child is the need to place the
> child as close to home as possible.  A new sentence has been added to paragraph
> (a) requiring recipients to take this factor into account.  As pointed out in several
> comments, the parents' right under § 104.36 to challenge the placement of their
> child extends not only to placement in special classes or separate schools but also
> to placement in a distant school and, in particular, to residential placement.  An
> equally appropriate educational program may exist closer to home; this issue may
> be raised by the parent or guardian under §§ 104.34 and 104.36.

34 C.F.R. Part 104 Appendix A.  In conjunction with the least restrictive environment standard, the school district must also consider the prospect that a program will provide meaningful educational benefit.

### 2.   *Reasonable likelihood of educational benefit*

The IDEA "establishes a basic floor of education" for children with disabilities, guaranteeing them "[a] free appropriate public education," 20 U.S.C. § 1412(a)(1)(A), but not a "gold standard" or ideal program.  Under the IDEA a school system need provide only a program "reasonably calculated" to deliver "educational benefits."  Rowley, 458 U.S. at 207; Five Town, 513 F.3d at 284.  The purpose of the IDEA is "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."  Rowley, 458 U.S. at 192.  "The correlative requirements of educational benefit and least restrictive environment operate in tandem to create a continuum of educational possibilities," Roland M., 910 F.2d at 993, and in order "to determine a particular child's place on the continuum, the desirability of mainstreaming must be weighed in concert with the Act's mandate for educational improvement."  Id.

A residential placement may well be optimal where educational benefit is concerned. Nevertheless, unless a residential program is necessary to ensure educational benefit, its potential advantages cannot be treated as talismanic in a placement decision that sends the student to a program far from home.  Instead, whenever possible, the school district should offer an appropriate and adequate program that the family can reasonably access from the home district that allows for both educational progress and meaningful integration among nondisabled students.  Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1050 (5th Cir. 1989) (interpreting the least restrictive environment provision in the Education of the Handicapped Act, the IDEA's

33

predecessor).  Educational benefit and least restrictive environment "operate in tandem to create a continuum of educational possibilities."  Roland M., 910 F.2d at 993.

As all of these authorities reflect, the determination of a particular child's Individualized Educational Program requires that "the desirability of mainstreaming . . . be weighed in concert with the Act's mandate for educational improvement."  Id.  To fulfill this obligation, a school district must not only weigh these standards, but must also make its determination based on substantive information presented to the Pupil Evaluation Team.

### 3.  A substantive basis for programming and placement decisions

"The development of an IEP is meant to be a collaborative process."  Five Town, 513 F.3d at 285.  The Pupil Evaluation Team is gathered and convened for that very purpose.  Id.  In addition to teachers and administrators with related training and experience, parents are counted as important team members with relevant knowledge concerning the student's disabilities and needs.  In addition, outside consultants may round out a team when their expertise and knowledge concerning the student and her disability exceed that of the other team members or are otherwise beneficial to the decision-making process.[18]  Id. (citing 20 U.S.C. § 1414(d)(1)(B)).  While participation by outside consultants is not always required, when their input is needed it is not to be disregarded by the school district.  The IDEA specifies that "the determination of . . . the educational needs of the child shall be made by a team of qualified professionals and the parent of the child."  20 U.S.C. § 1414(b)(4)(A).

The presence of a given team member at a team meeting is important.  The IDEA restricts the conditions on which the absence of a team member can be tolerated.  For example,

---

[18]     Where the disability in question is deaf-blindness, Maine regulations require assessments by "specialists in the field."  Code Me. R. 05-071-101 § VII.2.B.(2).(c).

absent the consent of both the parent and the school district, a team member cannot be excused

from a meeting at which his or her area of the curriculum or related services is discussed or

modified unless that member submits in writing "input into the development of the IEP prior to

the meeting." Id. § 1414(d)(1)(C); 34 C.F.R. § 300.321(e)(2). The significance of individual

assessments by qualified professionals is also highlighted in the requirement that the school

district "shall ensure that . . . assessments and other evaluation materials used to assess a child

. . . are used for purposes for which the assessments or measures are valid and reliable." 20

U.S.C. § 1414(b)(3)(A)(iii). Trying to produce an Individualized Educational Program to

address a student's individualized special education needs without consulting professionals

qualified to speak to the student's needs is like trying to determine the winner of a trial with no

witnesses. Winners can be determined, of course, based on who held the burden of production

and persuasion, but in the context of developing and implementing an Individualized Educational

Program the burden falls on the school system, not on the parent. The IDEA clearly places the

onus on the school system to take the steps necessary to develop and update an Individualized

Educational Program and to obtain the data needed to determine the special education needs of

the student. Id. § 1414(c)(2) ("The local educational agency shall administer such assessments

and other evaluation measures as may be needed to produce the data . . . .").

### 4. *Dispute resolution before a hearing officer*

There are three avenues for dispute resolution under the IDEA: mediation, an

administrative due process hearing, and civil litigation. Id. § 1415(b), (e)-(i). The IDEA

mandates that states provide a due process proceeding to parents who submit a complaint with

respect to, among other things, the educational placement of a child. Id. § 1415(b)(6), (f).

Pursuant to this mandate, Maine law provides for a due process hearing before "an impartial

hearing officer who shall conduct a hearing regarding the identification, evaluation and educational program of the student and shall make findings of fact and issue a decision." 20-A M.R.S. § 7207-B(2)(A). Maine law imposes an obligation on the Maine Commissioner of Education to "adopt rules governing the procedures for conducting due process hearings." Id. § 7207-B(1). Maine law does not specify which party bears the burdens of production and persuasion and the Code of Maine Rules does not fill in this void.

The hearing officer ruled that Ms. Millay bore the burden of persuasion at the due process proceeding. The IDEA does not assign the burden of persuasion when it comes to due process hearings. Consequently, the Supreme Court has held that the default rule is that the party seeking relief bears the burden. Scaffer v. Weast, 546 U.S. 49, 51 (2005). The Supreme Court has observed, for instance, that the school system might bear the burden if it seeks relief of its own based on a desire to change an IEP despite an absence of parental consent. Thus:

> School districts may also seek such hearings, as Congress clarified in the 2004 amendments. See S. Rep. No. 108-185, p 37 (2003). They may do so, for example, if they wish to change an existing IEP but the parents do not consent, or if parents refuse to allow their child to be evaluated.

Id. at 53. However, where the question to be addressed at an administrative hearing is "the appropriateness of an IEP," id. at 56, the parent ordinarily will lose "if the evidence is closely balanced," id. This framework concerns the burden of persuasion only and not the burden of production. In contrast to the burden of persuasion, the burden of production concerns the issue of "which party bears the obligation to come forward with the evidence at different points in the proceeding." Id. The Schaffer opinion addressed only the burden of persuasion. Id.

In this case, both Ms. Millay and Surry requested relief from the hearing officer. Ms. Millay asserted as her primary issue a denial of a free appropriate public education during the

relevant timeframe.  (Agency Index Vol. I at 4.)  For its part, Surry also requested a due process hearing and consolidation of its request with Ms. Millay's, recognizing that they both raised some of the same issues.  (Id. at 128-30.)  Surry recognized that one of the issues was its own order to change the placement for YRM's program.  (Id. at 128.)

Surry's request for a due process hearing does not automatically shift the burden to it. The mere fact that it requested a hearing ought not shift the burden of persuasion away from Ms. Millay insofar as the appropriateness of the IEP is concerned.  However, in this case Surry has argued for either residential placement far from home or day treatment in programs that would isolate YRM from other students.  Moreover, as the MDOE Report demonstrates, this case has a disturbing history and the Court has determined that the status quo as of the commencement of this litigation and as of the time of the due process hearing called for implementation of the Perkins-based IEP at Surry.  Surry's IEP for the 2007-2008 school year altered the status quo and did so in a way that would alleviate it from having to directly administer YRM's program.  Under these circumstances, a hearing officer would have been justified in shifting the burden of persuasion to Surry, at least as to the issue of Surry's placement decision for the 2007-2008 school year.  This is a close question, but the Court does not need to resolve it in the end.  If the Court leaves the burden of persuasion with Ms. Millay, it means only that the hearing officer would have been justified in declaring Surry the winner if the evidence was closely balanced.  It does not relieve Surry of the burden of *producing* evidence that it complied with IDEA by supporting its placement order with some reliable data, or that the programming placement was in place at the start of the school year.[19]  More importantly, burdens aside, for reasons set forth in

---

[19]      The hearing officer found that the Kids Peace program was a new autism program that would not be ready at the start of the 2007-2008 school year.  (Hr'g Officer's Docs. at 424.)

the merits portion of this discussion, the record does not contain evidence of an appropriate placement as of the start of the 2007-2008 school year, and Ms. Millay carries her burden of persuasion on this essential point.

### 5. The IDEA standard for judicial review

The procedural task Congress has assigned to the courts in IDEA actions is to "receive" the record of the administrative proceedings, consider additional evidence offered by a party, and grant "appropriate" relief based on a preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(B). That task has been interpreted as requiring the courts to review the administrative proceedings using a unique, intermediate standard of review that involves independent consideration of the evidence and an evaluation of the hearing officer's decision that is more vigorous than clear-error review, but less vigorous than *de novo* review.  This standard tempers a court's authority to grant appropriate relief in recognition of the fact that judges generally lack specialization in education policy.  Rowley, 458 U.S. at 206-208;  Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993).  When a hearing officer's decision rests on a matter of educational policy, it is presumed to arise from specialized knowledge, and is due a greater degree of deference.  Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 24 (1st Cir. 2008) (citing Nack v. Orange City Sch. Dist., 454 F.3d 604, 609 (6th Cir. 2006), and characterizing the Nack opinion as "observing that district court *may* give some deference to the fact findings of the hearing officer, especially when educational expertise is essential to the findings") (emphasis added).

With respect to mining the administrative record, the Court's review of the evidence is to be aided by the parties, particularly the complaining party, for "the burden rests with the complaining party to prove that the agency's decision was wrong."  Roland M., 910 F.2d at 991 (citing Kerkam v. Mckenzie, 862 F.2d 884, 887 (D.C. Cir. 1988) ("[W]e think it clear that a

38

party challenging the administrative determination must at least take on the burden of persuading the court that the hearing officer was wrong.")).  "In the end, the judicial function at the trial-court level is 'one of involved oversight,' and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale." Lenn, 998 F.2d at 1087 (quoting Roland M., 910 F.2d at 989)).  In this process, "the administrative proceedings must be accorded due weight," and the Court will not be "at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." Lenn, 998 F.2d at 1087 (quoting Rowley, 458 U.S. 176, 206 (1982)).

## C.  The Merits Concerning the 2007 Summer Program and the 2007-2008 Placement

The hearing officer divided the dispute into two issues:  (1) whether the 2007 ESY program was appropriate and (2) whether the 2007-2008 school-year Individualized Educational Program  "could be implemented appropriately in the Surry Elementary School or in any of the other placements offered by the school."  I address the 2007-2008 school year issue first, because it is the more significant issue by far.  The primary issue in this case is whether Surry provided adequate programming for the school year.  With respect to the 2007-2008 Individualized Educational Program, the hearing officer formulated the issue as whether a series of private placement alternatives could have implemented the program.  (Hr'g Officer's Docs. at 423, 427.) This formulation differs from Ms. Millay's formulation of the issue, which in her view was whether Surry "failed to provide an educational program."  (Agency Index Vol. I at 4.)  Instead, it tracks Surry's statement of the issue.  In Surry's view, the question is simply whether any one of its placement "offers" was appropriate.  (Id. at 128.)  The hearing officer chose to follow the lead of focusing on placement "offers" rather than on the placement decision that Surry ordered.

Thus, he states in his decision that "[t]he school first offered Perkins as a placement for the student." (Hr'g Officer's Docs. at 423.)  From there, he lists three other offers, in the following order:  Stillwater Academy, Kids Peace, and Surry Elementary.  (Id. at 423-24.)  Ultimately, the hearing officer did not address whether Stillwater or Kids Peace could have provided YRM with a free appropriate public education.[20]  Rather, he addressed the Perkins offer exclusively and concluded not merely that it was an appropriate placement, but that it was the least restrictive placement in which YRM could receive a free public education.  (Id. at 429, 433.)  He observed in a footnote that, given this conclusion, "it is not necessary to review any of the other placements offered by the school."  (Id. at 433 n.23.)  For reasons that follow, I conclude that this was an erroneous approach.

### 1.  The Perkins offer

At the June 21, 2007, Pupil Evaluation Team meeting, Attorney Herlan proposed a placement at the Perkins School and articulated a position for why such a placement would be best for YRM.  Discussion of this issue ensued and day treatment was also proposed as an alternative.  Although a Perkins proposal was voiced by Attorney Herlan, at the conclusion of the meeting Surry issued an IEP that designated day treatment as the placement, not the Perkins School.  Presumably, this placement decision took into consideration not only the concern of Ms. Millay and Jeff Jones over YRM's health, but also least restrictive environment considerations.  Although a day treatment placement raises its own concerns about least restrictive environment,

---

[20]     The hearing officer did conclude "that this student needs more in the way of services than any public elementary school, especially one in Hancock County, Maine, can be expected to provide (albeit in the context of discussing Surry's efforts to administer a pre-Perkins IEP).  (Hr'g Officer's Docs. at 430.)  In my review of the record I have not come across a statement by any of the special education professionals and administrators to the effect that the MDOE is incapable of providing a regional program in a public school setting in Hancock County that would be capable of providing a student like YRM with a FAPE.  There are, however, statements to the effect that such a program could not be offered at Surry Elementary and they do supply a substantive basis for this much of the hearing officer's factual determination.

the residential aspect of a Perkins placement makes it the most restrictive of all the placement options discussed.  Moreover, the record demonstrates that serious concerns arise with such a placement because of YRM's past difficulties adjusting to the residential component of such a placement.  Surry's ultimate decision to order placement in a day treatment location reflects a balancing determination that placement in day treatment is less restrictive than placement in a residential program and it also reflects a determination that meaningful educational benefit could be achieved in the day treatment setting.  The hearing officer's disregard of the placement determination actually specified in Surry's Individualized Educational Program in order to focus on the best possible (albeit most restrictive) educational programming was legally erroneous because it effectively jettisoned the balance between educational benefit and least restrictive environment ostensibly reflected in the written Individualized Educational Program.

A parent and school system may well agree to placement in the most restrictive setting, but the overarching purpose of the least restrictive environment requirement would be for naught if the school system could effectively order residential placement when less restrictive options exist that can afford meaningful educational benefit.  Presumably Surry recognized this dilemma when it ordered placement in a day treatment program within a reasonable commuting distance of YRM's home.  The parental notice of change of program that Mr. Caron sent Ms. Millay on August 15, 2007, reflects that placement was changed to a day treatment program because Ms. Millay's request for an MDI High School placement was "not sufficiently structured" and because Ms. Millay "rejected residential for medical reasons."  (District's Docs. Vol. III at 589.) While Surry may not have been convinced that YRM could not adapt to a residential program, it did not resist Ms. Millay's medical objection and it did not find that a residential placement was

required to ensure educational benefit for YRM.  If that is what Surry wished to determine, it had

an obligation to put that placement decision in writing and to describe the data that supported it.

See Union Sch. Dist. v. Smith, 15 F.3d 1519, 1526 (9th Cir. 1994) ("We find that a school

district cannot escape its obligation under the IDEA to offer formally an appropriate educational

placement by arguing that a disabled child's parents expressed unwillingness to accept that

placement.  The IDEA explicitly requires written prior notice to parents when an educational

agency proposes, or refuses, to initiate or change the educational placement of a disabled

child.").

The written notification requirement is relatively rigorous.  It calls for, among other

things:

> (B) an explanation of why the agency proposes or refuses to take the action and a
> description of each evaluation procedure, assessment, record, or report the agency
> used as a basis for the proposed or refused action;  . . . (E) a description of other
> options considered by the IEP Team and the reason why those options were
> rejected;  and (F) a description of the factors that are relevant to the agency's
> proposal or refusal.

20 U.S.C. § 1415(c).  If Surry wished to order a Perkins placement, it was obligated to describe

the factors that necessitated that placement.  In fact, the notice Surry sent to Ms. Millay can only

fairly be read as rejecting a Perkins placement on the ground that Ms. Millay refused it for

medical reasons.[21]  The hearing officer should not have permitted Surry to resurrect a proposal

rejected in the collaborative process and never properly justified in writing.[22]

---

[21]    Another notice in the record reinforces this position even more forcefully.  An August 23, 2007, notice
states that the team agreed to revise the Perkins behavior plan to remove "elements that related to [YRM's]
residential placement there."  (Written Notice of August 23, 2007, District's Docs. Vol. IV at 797 § 2(3).)

[22]    This recommendation may be adjudged by the Court to involve application of a "four corners" rule, but the
focus of this recommendation is, more squarely, to enforce the IDEA's notice requirement and honor the
collaborative process.  See Five Town, 513 F.3d at 285 (passing on whether to adopt a four corners rule). The
Individualized Educational Program and meeting minutes nowhere suggest that a residential program was needed to

###### 2.  *Remand is not warranted*

If the Court should agree that the hearing officer's ultimate conclusion was erroneous, a question arises whether to remand the matter so that the hearing officer can address the appropriateness of the placement actually specified by Surry in its written Individualized Educational Program.  That question depends, primarily, on whether the Court believes that the "peculiar expertise of an administrative hearing officer" is needed to aid in the determination.  Pihl v. Mass. Dep't of Educ., 9 F.3d 184, 191 (1st Cir. 1993) (quoting Lester H. v. Gilhool, 916 F.2d 865, 869 (1st Cir. 1990)).  It also depends on whether the Court believes that the advantages of remand outweigh the inefficiencies of further delay.  I recommend that the Court not remand this dispute for further administrative proceedings because the record is clear that Surry failed to have any day treatment placement in effect at the start of the school year and failed to make any substantive presentation during the Pupil Evaluation Team meetings that would support a finding that either day placement facility was actually prepared to administer YRM's Individualized Educational Program.  Determination of the issue at this time is also warranted because it will avoid unnecessary delay in an already protracted dispute and because both of the parties have briefed the issue without requesting remand. [23]

---

ensure educational benefit.  If residential placement is not needed, it is erroneous to make the advantages of a residential program the determining factor in a placement decision.  This point is routinely emphasized in cases where parents seek tuition reimbursement for unilateral placements at private schools.  There is no good reason why it should not apply with equal force to prevent a school from forcing a residential placement against the parents' wishes.

[23]     Because the record supports Ms. Millay's challenge to the hearing officer's decision, it is not necessary to address Ms. Millay's contention that the hearing officer was biased against her.  However, if the Court were to consider a remand, it would want to address these contentions.  It appears from Ms. Millay's complaint that she complained to MDOE Commissioner Susan Gendron about state special education director David Stockford and that somehow HO Stewart came to think that Ms. Millay had filed a complaint against him rather than against Mr. Stockford.  (Am. Compl. ¶¶ 86-87;  see also Ms. Millay's Brief at 23-24.)  According to the amended complaint, HO Stewart called Ms. Millay at home and spoke to her in an "irate [and] angry manner for about twenty minutes."  (Am. Compl. ¶ 87.)  The Court would likely want to consider these allegations before remanding the matter for further proceedings before Mr. Stewart.  See, e.g., Taylor v. Hayes, 418 U.S. 488, 503 (1974) (finding unacceptable

### 3. The day treatment placement

Ms. Millay argues that she was justified in rejecting Surry's day treatment placement because Surry's consultant, Dr. Godfrey, indicated that a Kids Peace placement would be inappropriate and because the evidence offered to support a Stillwater Academy placement was limited to Dr. Godfrey's assumption that Stillwater Academy could put together a program, based on a conversation with a solitary, unidentified employee of that program.  Ms. Millay complains that no one from these programs ever attended a team meeting and that there was no indication that Surry had actually arranged for a program in a meaningful fashion.  (Pl.'s Mem. at 18, Doc. No. 115.)  Dr. Godfrey, whom Surry had retained as a consultant to address the appropriateness of the day treatment options and who advised against a Kids Peace placement, was also absent from the meeting at which Surry ordered the Kids Peace placement.  The only professional support offered for the placement was voiced by Ms. Sanborn, who merely stated that she felt Kids Peace could accommodate YRM in its new autism program.  However, the opinion she voiced was not backed up with any data at that time.  Even the written Individualized Educational Program equivocates on the issue of placement:  "At this time, the location would be Kids Peace since Stillwater Academy is not available until November."  (District's Docs. Vol. IV at 793.)  This approach fell short of the IDEA's requirements.

YRM had a demanding Individualized Educational Program that had not been administered for a protracted period.  It was incumbent upon Surry to produce substantive support for its placement decision so that Ms. Millay and the rest of the team could meaningfully understand whether Kids Peace or Stillwater Academy could implement the program and could

---

bias where "marked personal feelings were present on both sides" and "unseemly conduct [had] left personal stings").

understand what, if any, exposure to non-disabled students would be available to YRM. Unfortunately, this never occurred.  Surry's day treatment placements did not conform to the IDEA's mandates.

Surry failed to put into effect by the start of the 2007-2008 school year an Individualized Educational Program designed to afford a free appropriate public education to YRM and YRM should not lose out because of Ms. Millay's refusal to place her daughter on a day treatment trial balloon.  In fairness to Surry, it appears that it was attempting to develop a temporary transitional program in the day treatment setting where staff would receive training and where programming would be developed, all of which might eventually transition with YRM back to a public school setting.  The real problem is that this approach was too little, too late to meet the rigorous demands of the IDEA.  It might have been different had Surry actually put the pieces in place earlier and honored the Individualized Educational Program process by incorporating some meaningful input from the proposed day treatment providers prior to the start of the school year. Unfortunately, it did not transpire that way.[24]

---

[24]     Surry introduced evidence related to these programs at the due process hearing, as reflected in its brief. (Doc. No. 129 at 21-22.)  The testimony Surry cites is problematic from the perspective of trying to demonstrate that a proper placement was in effect in time for the 2007-2008 school year.  For one thing, all of the testimony Surry emphasizes in its brief came from Surry staff.  For another, it does not reflect a very timely approach.  For example, Ms. Beckwith testified that they were planning to locate a new modular classroom at Kids Peace, but these plans were merely formulating in September, when Superintendent Boothby and Jeffrey Raymond (presumably of Kids Peace) "were looking at building or coming up with a program for [YRM]."  (Agency Index Vol. XII at 2336.) Also, Superintendent Boothby testified:  "Understanding that [YRM]'s complications went beyond their programming, they were still very interested in working with us . . . ."  (Id. Vol. V at 838.)  Rebecca York, the certified special education instructor hired in mid-September to be the primary person assigned to YRM observed that "[i]nitially we were going to be working towards getting her into a day treatment . . . program, and it was looking like it was going to be at Kids Peace setting."  (Id. Vol. V. at 848.)  Ms. York's testimony, however, presents a very promising picture of a beneficial program beginning to take shape for YRM in this timeframe.  Notably, a significant investment was made by Surry in Ms. York's training, some of which was provided at Kids Peace and some at Perkins and other locations, though this training seems to have taken place on a continuing basis through the November time period.  (Id. at 848-50.)  Surry may have had all of the essential components of a program in place by 2008, though that would not negate the failure to have a proper placement at the beginning of the school year. Nor would it override a failure to issue an appropriate written Individualized Educational Program after the start of the 2007-2008 school year, supported with appropriate data and information.  On another note, a review of Ms.

### 4.  A Surry placement

The parties continued to communicate into the school year about programming and placement.  On December 6, 2007, Surry issued another written notice following an effort to achieve a resolution.  That notice proposed "a transition plan to assist [YRM]'s entry into either the Kids Peace Day Treatment program or into the Surry Elementary School."  (District's Docs. Vol. VI at 1052.)  The notice did not fill any of the voids associated with the earlier day treatment placement decision.  Instead, it relied on supposed explanations contained in earlier written notices and team minutes.  (Id. at 1053.)  What was new with the December 2007 notice was an offer to accommodate the provision of some services at Surry Elementary.  (Id. at 1053, 1056-1059.)  However, the notice does not suggest that the services specified in the Individualized Educational Program could actually be provided at Surry Elementary and the hearing officer has concluded that Surry Elementary was not capable of providing the services called for in YRM's Individualized Educational Program.  In its brief to the Court, Surry merely states that it sought to have "YRM back in *some* school program."  (Def.'s Mem. at 8, Doc. No. 129 (emphasis added).)

Although Surry was still not in a position to begin supplying YRM with meaningful educational benefit in the first three or four months of the school year, developments as of December may have put Surry on the proper course.  These developments may play a role with regard to determining the nature and scope of an equitable remedy.  However, the record cannot support a finding that the hearing officer erred when he found that the services called for in

---

York's testimony suggests that an educationally beneficial program might have been administered in a public school setting by a special educator with her training, support staff, and a proper mix of consultative services supplied by outside professionals.  (Id. at 852, 856-57.)  This, of course, simply foreshadows the dispute pending in Case No. 1:09-cv-411 concerning the 2008-2009 school year.  Moreover, HO Stewart concluded that Surry could not provide an appropriate public education in a public school placement in Hancock County.

46

YRM's Individualized Educational Program could not be adequately administered at Surry during the 2007-2008 school year.

### 5. *The Summer 2007 ESY issue*

Surry requested that the hearing officer address the issue of whether the 2007 extended school year summer program was adequate and the hearing officer concluded that the program was adequate because the set of services it called for, all with designated services providers and staff, was "well designed to meet the needs of this student" and because "[a]ll of the participants in the June 21 PET, including the student's mother, agreed that the contents of the program were appropriate for her." (Hr'g Officer's Docs. at 421.) He also noted that the 2007 summer program would have been better than the 2006 summer program, which the mother had considered successful, because it offered more and better programming. (Id. at 422.) The record adequately supports this determination.

Extended school year services are a necessary component of a Individualized Educational Program for students who require extended services in order to obtain a free appropriate public education. 34 C.F.R. § 300.106. There is no dispute that YRM qualifies for extended services and all of the Individualized Educational Programs at issue in this case have consistently called for the provision of summer programming. I recommend that the Court uphold the determination that the 2007 extended school year program was sufficient because it was adequate to prevent regression. Additionally, there is record support for the hearing officer's determination that Surry was actually prepared to provide meaningful summer programming to YRM in the summer of 2007. While it is true that the summer program was not adequate to ensure that YRM would be able to begin achieving meaningful educational benefits at the start of

the school year, that simply reinforces the conclusion that Surry failed to afford a free

appropriate public education for all, or a portion of, the 2007-2008 school year.

### 6. *Some considerations regarding remedy*

Surry violated the IDEA by failing to have a free appropriate public education placement

in effect at the start of the 2007-2008 school year. Additionally, the MDOE has found that Surry

denied YRM a free appropriate public education commencing in spring 2006. Ms. Millay's

request for relief appropriately extends back to spring 2006 and she exhausted her administrative

remedies by requesting a due process hearing that would address these earlier events in addition

to the placement decision for the 2007-2008 school year. The parties should be heard further on

the issue of remedy. Both parties have supplemented the record and have sought additional

supplementation to address the issue of remedy, should it prove necessary, but neither party has

truly briefed the issue. The IDEA provides simply that the Court "grant such relief as the court

determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). As suggested in footnote 24, *supra*,

Surry was making progress with YRM's special education program and may well have had all of

the pieces in place by 2008 to supply YRM with a free appropriate public education. On the

other hand, it is not clear from the current briefs what portions of the record the Court would

look to in order to determine whether or when Surry came into compliance with the IDEA over

the course of the 2007-2008 school year. The hearing officer did not address the issue and the

parties have not adequately briefed the issue or mapped the administrative record and

supplemental materials for purposes of making such a determination.

Notwithstanding the foregoing, it is safe to say that Ms. Millay's requested relief

substantially exceeds what one would ordinarily expect in a case that preserves an IDEA claim

involving less than two and one-half school years. In her words:

48

Plaintiff requests that YRM be provided compensatory education services in part through an extension of her school years until age 23 for the year denied (the MDOE has already ordered one additional year) and in part through an education trust fund that will provide for the continuation of services to enable her to recover from regression insofar as possible, including day programming and individual life skills instruction, orientation and mobility training, augmentative communication training, independent life skills training,[] and other needs and services in her Individual Education Plan over a period of three additional years to attempt to recover the regression caused by the lack of (and in the case of orientation and mobility and augmentative communication training) the needless denial of all beneficial programs and services requested over the past three years.

Plaintiff requests the opportunity to apprise this Court of the likely future cost of such services, and requests that, in the event Defendant fails to maintain YRM in her current placement or an equivalent one over the ensuing years, it must compensate her for the additional loss and regression at the same stated amounts.

Plaintiff also requests compensation for her own time in attempting to mitigate the regression to YRM and in being compelled to litigate the above issues due to the violations of law, including harassment and retaliation by Defendant and its administrators.

(Pl.'s Mem. at 37 (footnote omitted and subsequent request for money damages also omitted).) Although Ms. Millay has carried her burden of demonstrating a need for equitable relief in the form of compensatory education on this record, her request for more than three years of compensatory education services goes beyond the loss associated with the less than three school years at issue in this proceeding.  "[C]ompensatory education is not an automatic entitlement but, rather, a discretionary remedy for nonfeasance or misfeasance in connection with a school system's obligations under the IDEA."  Five Town, 513 F.3d at 290.

As for Ms. Millay's request for monetary compensation for the burdens she has endured, personally, "[n]o general compensatory damages may be awarded," and what monetary recovery is permitted must arise in equity, such as an order to reimburse Ms. Millay for expenses that should have been borne by Surry all along, such as actual expenditures Ms. Millay made in order to ensure the provision of appropriate educational services to YRM.  Diaz-Fonseca v. Puerto

Rico, 451 F.3d 13, 19 (1st Cir. 2006); Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 124 (1st Cir. 2003). Ultimately, it may prove advisable to issue an order specifying the duration of compensatory educational services that must be provided and remand the matter to YRM's Pupil Evaluation Team, which is better able to assess YRM's needs at this juncture and could most expeditiously do so outside the context of court proceedings or administrative due process proceedings. See, e.g., Mr. I., 480 F.3d at 26.

In any event, the Court may well find it advisable to withhold further hearing on proposed remedies until after resolution of the proceedings concerning the decision of a different hearing officer vis-à-vis the 2008-2009 school year, which is currently before the Court in Case Number 1:09-cv-411. That case was stalled at the motion to dismiss stage when the instant motions were referred, but it is clear that Count I of that complaint, to the extent it is asserted against Surry School Department and involves Ms. Millay's appeal of another hearing officer's decision under the IDEA, will survive the early round of dispositive motions because no motion to dismiss has been filed by Surry. In order to expedite proceedings as much as possible, I have issued a scheduling order that will govern Count I of the complaint in that case, applicable to Surry School Department and Millay only. If the Court ultimately denies the motions to dismiss related to any of the other counts or parties to that proceeding, an amended scheduling order will issue, but the current IDEA track scheduling order will continue to govern Count I of that case.

## IV.    DISABILITY DISCRIMINATION

In addition to her request for judicial review under the IDEA, Ms. Millay also asks the Court to conduct a jury trial on claims of disability discrimination. In count III she alleges a claim of intentional discrimination under section 504 of the Rehabilitation Act. (Am. Compl. ¶¶ 157.) In count IV she alleges another claim of intentional discrimination under the Americans

with Disabilities Act.  (Am. Compl. ¶ 159.)  Surry requests the dismissal of both claims pursuant to Rule 12(c).[25]  (Def.'s Mem. at 42 & n.38.)

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  To determine whether to grant judgment for the moving party, the Court must "accept all of the nonmoving party's well-pleaded factual averments as true and draw all reasonable inferences in [its] favor."  Feliciano v. Rhode Island, 160 F.3d 780, 788 (1st Cir. 1998).  So read, judgment on the pleadings should only enter if the complaint fails to raise a plausible entitlement to relief.  Citibank Global Mkts., Inc. v. Santana, 573 F.3d 17, 23 (1st Cir. 2009).

The IDEA states the following rule of construction:

> Nothing in this title shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this part, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this part.

20 U.S.C. § 1415(l).  The First Circuit has observed that this provision reflects that "the IDEA does not preclude claims . . . under the ADA [or] the Rehabilitation Act."  M.M.R.-Z v. Puerto Rico, 528 F.3d 9, 14 (1st Cir. 2008).  However, it has also "held that relief under these other statutes is not available where '[p]laintiffs' case turns entirely on the rights created by statute in the IDEA.'"  Id. (quoting Diaz-Fonseca, 451 F.3d at 29, and recognizing as cognizable a claim that school administrators retaliated against student by denying educational services after his family reported his special education teacher to the police, claims that did not mirror the IDEA

---

[25]     Surry uses some language in its memorandum that would suggest it is seeking summary judgment on an evidentiary basis.  (See Def.'s Mem. at 41 (stating that Ms. Millay failed to make a "showing of discriminatory animus") & 42 (stating she "failed to present any evidence of . . . damages").)

claim).  In other words, "the IDEA does not restrict rights and remedies that [are] already independently available through other sources of law."  Diaz-Fonseca, 451 F.3d at 29.

In this case, the additional counts for intentional discrimination are bound up in the IDEA's heightened requirements.  They are not premised on facts and circumstances extraneous to the process of trying to provide a free appropriate public education for YRM, as compared with denying all access or refusing to provide any special education programming.  As Surry argues, "the essence of the Parent's case is that YRM did not receive an appropriate educational placement."  (Def.'s Mem. at 39.)

In her reply memorandum, Ms. Millay characterizes Surry's conduct toward YRM as retaliatory.  She contends that retaliatory animus resulted in defamatory remarks that overstated the nature and severity of YRM's injurious behaviors.  (Pl.'s Reply at 9, Doc. No. 135.)  She also contends that retaliatory animus resulted in threats related to enforcement of Maine's habitual truancy law.  (Id. at 9-10.)  In addition to asserting retaliation, Ms. Millay argues that Surry violated YRM's right to equal protection by treating her as other than a ninth grader in order to create an additional stumbling block to enrollment at MDI High School.  (Id. at 7.)  Unlike her memorandum of law, Ms. Millay's amended complaint does not recite a claim for retaliation, defamation, or equal protection within its four counts.  Consequently, I treat these arguments as arising under the counts for intentional discrimination.[26]

> Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

---

[26]    If there were a claim under 42 U.S.C. § 1983 for violation of the Equal Protection Clause, my recommendation on such a claim would follow the reasoning of my recommendation on counts III and IV.  Another obstacle to such a claim involves the absence of any allegations that would support a plausible inference that the Town of Surry has a municipal policy of violating the equal protection rights of disabled students.  In a recommendation on motions to dismiss filed in Case No. 1:09-411, I have also attempted to explain why an equal protection theory does not fit the facts of this case.

> discrimination under any program or activity receiving Federal financial
> assistance."  29 U.S.C. § 794(a).  Similarly phrased, the ADA mandates that "no
> qualified individual with a disability shall, by reason of such disability, be
> excluded from participation in or be denied the benefits of the services, programs,
> or activities of a public entity, or be subjected to discrimination by any such
> entity."  42 U.S.C. § 12132.  Because "Title II of the ADA was expressly modeled
> after Section 504 of the Rehabilitation Act," <u>Theriault v. Flynn</u>, 162 F.3d 46, 48
> n.3 (1st Cir. 1998), the Court analyzes these two independent claims in the "same
> manner."  <u>K v. City of S. Portland</u>, 407 F. Supp. 2d 290, 296 (D. Me. 2006).

<u>Millay v. Surry Sch. Dep't</u>, 584 F. Supp. 2d 219, 235 (D. Me. 2008).

Surry argues that the counts under the Rehabilitation Act and the ADA cannot go forward because Ms. Millay is simply trying to obtain remedies that are not available in an IDEA action. (Surry's Mem. at 39.)  The First Circuit has held that "where the underlying claim is one of violation of the IDEA, plaintiffs may not use § 1983—*or any other federal statute for that matter*—in an attempt to evade the limited remedial structure of the IDEA."  <u>Diaz-Fonseca</u>, 451 F.3d at 29 (emphasis added).

Ms. Millay's arguments that an overly severe description of YRM's behavioral issues and a refusal to acknowledge her as a ninth grader amount to actionable discrimination or retaliation are not appropriate under <u>Diaz-Fonseca</u>.  Such assertions by a school entity fall squarely within the bounds of the IEP decision-making process.  If such assertions could support independent claims of discrimination or retaliation, then essentially every challenged evaluation or assessment could.  Raising a ground for denying a preferred placement is part and parcel of the IEP process.  So is the process of characterizing the nature and severity of a student's learning disability.  These assertions are not actionable under the Rehabilitation Act or the ADA because they are inherently claims arising by virtue of the procedural framework mandated by the IDEA. Absent the IEP process designed to carry out the special education objectives of the IDEA, this

scenario would not have arisen and Surry would not have been exposed to liability for making such statements in order to justify its placement decision over Ms. Millay's placement request.

The final component of Ms. Millay's claims for money damages concerns "threats" related to truancy enforcement based on Ms. Millay's decision to keep YRM home during the 2007-2008 school year.  (Pl.'s Reply at 9-10.)  In her amended complaint Ms. Millay alleges that "Maine special education director David Stockford threatened Plaintiff . . . that if Plaintiff did not place YRM in the District's choice of placement he would file a child protective complaint, bring a truancy complaint, and try to terminate State funding for YRM's UCP services."  (Am. Compl. ¶ 85;  see also Pl.'s Mem. at 23-24.)  According to the complaint, Mr. Stockford is an employee of the Maine Department of Education, not Surry.  Surry cannot be held liable for Mr. Stockford's conduct.  Ms. Millay also alleges, however, that Superintendent Boothby later authored a letter containing the same threats about truancy, after child protective investigators had already investigated the matter and concluded there was no wrongdoing.  (Am. Compl. ¶ 88.)  Mr. Boothby's letter is referred to in Ms. Millay's brief as being sent in November 2007.[27] (Pl.'s Mem. at 25.)  There is no allegation of this threat being carried out.  Rather, it appears from the face of the complaint that the truancy issue had already been vetted by the MDOE on its own initiative and investigated by child protective services as of the time of Superintendent Boothby's letter.  (Am. Compl. ¶¶ 85, 86, 88.)[28]  In my view, the truancy letter issue is another inevitable

---

[27]      The letter is in the record submitted by Ms. Millay.  (Parent's Docs. Vol. II at 590-91.)

[28]      The Court does not need to convert the motion into one for summary judgment in order to understand that the MDOE was already considering the truancy issue when Superintendent Boothby authored the letter in question, although that fact is reflected by documents contained in Ms. Millay's records.  (Parent's Docs. Vol. II at 563, 575.) Nor does the Court need to convert the motion in order to consider the content of Superintendent Boothby's letter because its authenticity has not been challenged by Surry, it is central to Ms. Millay's claim, and it is specifically referred to in Ms. Millay's amended complaint.  Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33-34 (1st Cir. 2001).

characteristic of this kind of IEP impasse.  Ms. Millay argues that she had no choice but to keep YRM home due to violations of the IDEA.  (Pl.'s Reply at 9.)  In contrast, Surry argues it has no choice but to report habitual truancy under Maine law.  (Surry's Mem. at 39, citing 22 M.R.S. § 4002(1).)[29]  This kind of wrangling is going to be inherent in any IDEA contest as drawn out and entrenched as this one has been and logically falls within the rule discussed in Diaz-Fonseca.  Moreover, as far as discrimination is concerned, truancy enforcement is meant to result in attendance at school, not exclusion from school.  Because this effort is designed to ensure attendance and participation, it does not run afoul of the Rehabilitation Act and the ADA's prohibition against exclusion from programs and activities on the basis of disability.

A retaliation theory presents a more subtle issue in the context of a truancy letter.  The theory would be that Surry was threatening a report of habitual truancy in retaliation for the embarrassment of the MDOE Report.  Although the word retaliation does not exist in the amended complaint, retaliation is recognized to be a form of discrimination.  Gomez-Perez v. Potter, 128 S. Ct. 1931, 1935, 1937 (2008).[30]  As stated previously, I conclude that this truancy enforcement theory of retaliation is subsumed within the rule applied in Diaz-Fonseca.  The truancy concern is an inevitable feature of an IDEA controversy in which the parent refuses to send a child to what she regards as an inappropriate special education program that the school maintains is appropriate, at least where the parent has not arranged for placement in a private program of her own choosing or submitted paperwork in support of a home-schooling program.  After all, it is the IDEA that generates Ms. Millay's contention that YRM is entitled to a specific special education program to be administered at a specific public high school.  Relabeling the

---

[29]     See also 20-A M.R.S. § 5051-A(2)(C).

[30]     The ADA contains a specific anti-retaliation provision.  42 U.S.C. § 12203.

claims as retaliation claims does not succeed in making them something other than claims related to the evaluation and placement of YRM under the IDEA.  Weber v. Cranston Sch. Comm., 212 F.3d 41, 51 (1st Cir. 2000).  Consequently, I recommend that the Court dismiss the retaliation claim because, under Diaz-Fonseca, this factual scenario does not give rise to a plausible entitlement to relief against Surry beyond the remedies authorized by the IDEA.[31]

### CONCLUSION

For the reasons set forth above, I RECOMMEND that the Court overturn the decision of the hearing officer and extend the scope of this proceeding to include denials of a free appropriate public education as of spring 2006 and continuing through the 2006-2007 school year.  I further RECOMMEND that the Court overturn the decision of the hearing officer and find that the 2007-2008 school year placement ordered by Surry in August 2007 violated the IDEA because Surry failed to have available a placement that could afford YRM a free

---

[31]  It does not appear that Ms. Millay ever presented a claim in her due process hearing request that placement decisions were made as they were in order to retaliate against Ms. Millay or YRM on account of past complaint activity.  The IDEA requires exhaustion of administrative remedies under the IDEA prior to the assertion of Rehabilitation Act and ADA claims tethered to IDEA rights in order to preserve them for purposes of a subsequent civil action, and the hearing officer could have provided relief to Ms. Millay under the IDEA had she succeeded in demonstrating improper discriminatory or retaliatory motive.  Weber, 212 F.3d at 51-52 (citing 20 U.S.C. § 1415(b)(6));  see also 20 U.S.C. § 1415(l) (conditioning availability of relief under ADA and Rehabilitation Act on the exhaustion of remedies under the IDEA);  Burke v. Brookline Sch. Dist., No. 06-cv-317-JD, 2007 U.S. Dist. Lexis 18851, *3-4, 2007 WL 836820, *1 (D. N.H. Mar. 15, 2007) (order on mot. for reconsideration, not for publication) ("The IDEA provides for retaliation claims that are related to rights protected under the IDEA.").  This is not to say that Ms. Millay was required to present her claims under the Rehabilitation Act or the ADA to the hearing officer, only that she could have presented a theory of retaliatory motive as a component of her IDEA due process hearing.  Having said that, the exhaustion issue is not easy to resolve.  Judge Hornby of this District has concluded in a well-reasoned opinion that only the IDEA administrative requirements need be exhausted prior to seeking relief under Section 504 of the Rehabilitation Act and that there is no requirement that parents present or argue their Rehabilitation Act claims to the hearing officer.  Mr. I., 480 F.3d at 174-75 (reasoning that rigid enforcement of a waiver rule against pro se parents is counterproductive and not actually supported by the language of 20 U.S.C. § 1415(l)).  See also Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21, 25-26 (1st Cir. 2002) (treating claims of inadequate notice under the IDEA as waived due to failure to exhaust at the administrative stage).  Ultimately, I do not recommend that the Court dismiss the additional claims on the ground of a failure to exhaust.  The more appropriate approach is to dismiss them because they are presented on facts bound together with the IDEA claim and Diaz-Fonseca forecloses relief in such situations.

appropriate public education at the beginning of the school year.  Finally, I RECOMMEND that

the Court grant Surry's motion to dismiss counts III and IV pursuant to Rule 12(c).

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 22, 2009

57