UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JOANNE M. MILLAY, as parent of minor child YRM, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-07-178-B-W |
| | ) | |
| SURRY SCHOOL DEPARTMENT, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER AFFIRMING THE RECOMMENDED DECISION
OF THE MAGISTRATE JUDGE**

On December 22, 2009, the Magistrate Judge issued a thoughtful and extensive Recommended Decision in which she recommended: (1) that the Court overturn the decision of the hearing officer and extend the scope of this proceeding to include denials of a free appropriate public education beginning the spring of 2006 and continuing through the 2006-2007 school year; (2) that the Court overturn the decision of the hearing officer and find that the 2007-2008 school year placement ordered by the Surry School Department (Surry) in August 2007 violated the Individuals with Disabilities Education Act (IDEA) because Surry failed to have an available placement that could afford YRM a free appropriate public education at the beginning of the school year; (3) that the Court uphold the decision of the hearing officer that the 2007 extended school year (ESY) program was sufficient; and, (4) that the Court dismiss the Plaintiff's Rehabilitation Act, Americans with Disabilities Act, and civil rights (42 U.S.C. § 1983) claims because the facts do not give rise to a plausible entitlement of relief against Surry

beyond the remedies authorized by the IDEA.[1]  *Recommended Decision* at 56-57 (Docket # 137) (*Rec. Dec.*).  Surry filed its objection on January 4, 2010.  *Def.'s Objection to Portions of Magistrate's Recommended Decision* (Docket # 138) (*Def.'s Ob.*).  Joanne M. Millay, the parent of minor child YRM, filed her objection on January 19, 2010.  *Pl.'s Objection to Recommended Decision in Regard to Claims Arising Under Section 504, the ADA, and Section 1983* (Docket # 142) (*Pl.'s Ob.*).  On January 21, 2010, Ms. Millay responded to Surry's Objection and on January 26, 2010, Surry responded to Ms. Millay's Objection.  *Pl.'s Reply to Def.'s Objection to Magistrate's Recommended Decision* (Docket # 143) (*Pl.'s Reply*); *Def.'s Resp. to Pl.'s Objection to Portions of Magistrate's Recommended Decision* (Docket # 144) (*Def.'s Resp.*).

The Court reviewed and considered the Magistrate Judge's Recommended Decision together with the entire record and has made a *de novo* determination of all matters adjudicated in the Magistrate Judge's Recommended Decision.  The Court concurs with the Magistrate Judge's recommendations for the reasons in her Recommended Decision and for the additional reasons in this decision, and the Court determines no further proceeding on the adjudicated issues is necessary.

## I.    DISCUSSION

### A.    Joanne Millay's Objection

#### 1.    *Fitzgerald v. Barnstable School Committee*

---

[1] Whether Ms. Millay continues to assert a civil rights claim under 42 U.S.C. § 1983 is unclear.  The Magistrate Judge was similarly uncertain.  *Recommended Decision* at 52 n.26 (Docket # 137) (*Rec. Dec.*) (stating that "[i]f there were a claim under 42 U.S.C. § 1983 for violation of the Equal Protection Clause, my recommendation on such a claim would follow the reasoning of my recommendation on counts III and IV").  Ms. Millay's original Complaint asserted a claim for relief under "the U.S. Civil Rights Act, which prohibits discrimination in regard to [educational] services."  *Compl. and Mot. for Preliminary Emergency Inj.* ¶ 2 (Docket # 1).  The Court construed this allegation as arising under § 1983.  *Order on Pending Motions* at 3 n.2 (Docket # 53) (*Order on Pending Mot.*).  However, Ms. Millay withdrew this Complaint and filed an Amended Complaint, which contains no civil rights allegation and does not cite § 1983.  *Amended Complaint* (Docket # 44) (*Amend. Compl.*).  In its Order on Pending Motions, the Court liberally construed the allegations in the Complaint to survive the more restrictive allegations in the Amended Complaint.  *Order on Pending Mot.* at 9.  Thus, in excess of caution, the Court assumes Ms. Millay is continuing to press a civil rights action under 42 U.S.C. § 1983 and, as will be seen, agrees with the Magistrate Judge that the allegation is not viable.

Ms. Millay objects to the Magistrate Judge's conclusion that the claim under 42 U.S.C. § 1983 is not viable. *Pl.'s Ob.* at 2-3. She cites the Court's Order on Pending Motions dated October 28, 2008 to support her contention that the Amended Complaint stated a proper § 1983 claim. *Id.* at 2 (quoting footnote 3 as stating "[t]he Court construes this claim to arise under [§] 1983"). Ms. Millay is correct that the Court viewed the general allegation in her original Complaint of a violation of the "U.S. Civil Rights Act" as a claim under 42 U.S.C. § 1983, *Order on Pending Mot.* at 4 n.3 (Docket # 53); however, the Court's generous interpretation of her *pro se* allegation did not address whether the § 1983 claim was viable. In her Recommended Decision, the Magistrate Judge was clearly following First Circuit law when she concluded that Ms. Millay "may not use § 1983-*or any other federal statute for that matter*-in an attempt to evade the limited remedial structure of the IDEA." *Rec. Dec.* at 53 (quoting *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 29 (1st Cir. 2006) (emphasis in Recommended Decision)).

Ms. Millay then argues a more general point – namely that she should be allowed to proceed with her ADA, Rehabilitation Act, and § 1983 claims along with her IDEA claim. She points out that after the First Circuit issued *Diaz-Fonseca*, the United States Supreme Court decided *Fitzgerald v. Barnstable Sch. Comm.*, 129 S. Ct. 788 (2009), which held that a § 1983 gender discrimination claim was not subsumed by Title IX and could proceed independently. *Pl.'s Ob.* at 5. But, in her recommended decision in the companion case of *Millay v. Surry Sch. Dep't*, 09-cv-411-B-W, the Magistrate Judge thoroughly explained that as regards both the ADA and Rehabilitation Act claims "[t]he point of *Diaz-Fonseca* is not that the IDEA bars a plaintiff from bringing a complementary action under the Rehabilitation Act or the ADA, under any circumstances, but that it bars claims under these statutes when the plaintiff's assertion of a violation is grounded on the heightened protections available by virtue of the focused procedural

3

and substantive rights created in the IDEA." *Recommended Decision*, 09-cv-411-B-W at 12 (Docket # 25).   Regarding the § 1983 claim, *Fitzgerald* is distinguishable since, unlike Title IX, the IDEA provides an "unusually elaborate," "carefully tailored," and "restrictive" enforcement scheme. *Id.* at 13 (quoting *Fitzgerald*, 129 S. Ct. at 795).   Since Ms. Millay has not alleged "a constitutional violation above and beyond a violation of any of these three statutes," her claim is not viable. *Id.* at 13-14.

Moreover, as an inferior court, a district court is required to follow the decisions of the First Circuit and the First Circuit has not overruled *Diaz-Fonseca.*   "Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority." *Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004).   Here, for the reasons ably elucidated by the Magistrate Judge, *Diaz-Fonseca* requires the dismissal of Ms. Millay's Rehabilitation Act, ADA, and § 1983 claims and *Fitzgerald* does not, in the Court's view, unmistakably cast *Diaz-Fonseca* into disrepute.   If the First Circuit wrongly decided *Diaz-Fonseca*, Ms. Millay must convince the First Circuit.[2]

### 2.   The 2007 Extended School Year

Ms. Millay also objects to the Magistrate Judge's recommendation to uphold the hearing officer's recommendation regarding the 2007 Extended School Year. *Pl.'s Ob.* at 7-8.   The Court carefully reviewed Ms. Millay's contentions and still agrees with the Magistrate Judge's recommendation on this point for the reasons in the Magistrate Judge's Recommended Decision.

### B.   Surry's Objections

---

[2]   Ms. Millay requested oral argument; however, based on the filings, the Court has resolved that oral argument would not assist its resolution of the issues.   The Court DENIES the Plaintiff's request for oral argument. *Pl.'s Ob.* at 6.   Ms. Millay has also requested that this action be consolidated with her companion case, 09-cv-411.   The Court DENIES the Plaintiff's request. *Id.*

Surry lists its objections:

1) The Magistrate Judge erred by finding that the hearing officer lacked authority to consider Surry's residential placement offer as an appropriate placement for YRM;

2) The Magistrate Judge erred in concluding that the IEP team process in the summer of 2007 violated the IDEA and that any such procedural violation required rejection of the therapeutic day treatment placement offered by Surry for the 2007-2008 school year;

3) The Magistrate Judge erred in rejecting the hearing officer's conclusion that he lacked authority to consider the family's request that he enforce a Maine Department of Education complaint ruling involving YRM's 2006-2007 school year; and,

4) The Magistrate Judge erred in failing to enter any ruling at all on the issue of the remedy for any violations that may have occurred in this matter.

*Def.'s Ob.* at 1.

### 1.    The Hearing Officer's Authority

Surry claims that the Magistrate Judge based her recommendation against the Hearing Officer's finding that YRM required a residential placement at Perkins "almost exclusively on her belief that the hearing officer was somehow barred from considering any placement that was not specifically 'ordered' by the IEP team itself." *Id.* at 4. Surry says "[t]his is wrong, and a misunderstanding of the Team process itself. Hearing officers have broad discretion to consider a variety of placements when deciding what is appropriate for a child – and certainly can consider any placements that were considered by the Team." *Id.*

In her Recommended Decision, the Magistrate Judge reviewed the "relatively rigorous" written notification requirement of 20 U.S.C. § 1415(c), which requires "an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure,

assessment, record, or report the agency used as a basis for the proposed or refused action"; a "description of other options considered by the IEP [individualized educational program] Team and the reason why those options were rejected"; and, a "description of the factors that are relevant to the agency's proposal or refusal." *Id*. at § 1415(c)(1)(B), (E), (F). To the extent Surry complied with the notice requirements of § 1415(c), the Magistrate Judge observed that the notice Surry sent to Ms. Millay "can only fairly be read as rejecting a Perkins placement on the ground that Ms. Millay refused it for medical reasons." *Rec. Dec.* at 42. The Magistrate Judge concluded that the hearing officer "should not have permitted Surry to resurrect a proposal rejected in the collaborative process and never properly justified in writing." *Id.*

Surry's emphatic language clearly telegraphs its disenchantment with the Recommended Decision, but to simply declare the Magistrate Judge "wrong," to claim she betrayed a "misunderstanding of the Team process itself," and to assert that "[n]othing in the IDEA creates this legal barrier to hearing officer authority," is not helpful. Surry's citations to case law affirm only generally accepted propositions, such as the collaborative nature of the team process and the hearing officer's obligation to consider "all relevant factors." *Def.'s Ob.* at 4-8. But, counsel for the Defendant, a well respected specialist in the field of education law, has left it to the Court to seek legal authority for or against the narrow issue: whether a school's failure to comply with the notice requirements of 20 U.S.C. § 1415(c) restricts a hearing officer's authority to consider placements abandoned by the IEP team. Surry cites no case law on the point, and the Court could find none. In fact, in its memorandum, Surry ignores § 1415(c) altogether.

As a practical matter, if there are no repercussions for a school's failure to comply with the notice requirements of § 1415(c), the requirement itself becomes optional, which it clearly is not, since the statutory notice provision provides a critical procedural safeguard for parents and

gives them fair notice of what is at issue at the contested administrative hearing.  But, apart from repeatedly proclaiming the Magistrate Judge "wrong," Surry addresses none of these issues. Surry's failure to adequately develop its legal argument is a sufficient ground to overrule its objection.  *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) (stating that the "district court is free to disregard arguments that are not adequately developed").

Many courts limit their review to what is provided in the IEP when determining whether the IEP provides the requisite educational benefit in a given case.  *C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 285 (1st Cir. 2008) (citing cases); *see also Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 768 (6th Cir. 2001) ("The district court erred in relying on the [hearing officer's] finding that [the school district] had the capacity to offer [the child] an appropriate program.  The district court should have limited its assessment to the terms of the draft IEP document itself.  Although there was evidence in the record indicating what could have been provided at [the proposed school] only those services indentified or described in the draft IEP should have been considered in evaluating the appropriateness of the program offered.")); *Burilovich ex rel. Burilovich v. Bd. of Educ.*, 208 F.3d 560, 568 (6th Cir. 2000) (holding that oral proposal by school district about what could be offered is not an IEP); *A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 682 (4th Cir. 2007) (holding that the court could not consider placement offers not included in the written IEP because "[e]xpanding the scope of a district's offer to include a comment made during the IEP development process would undermine the important polices served by the requirement of a formal written offer"); *Sytsema ex rel. Sytsema v. Acad. Sch. Dist. No.*, 538 F.3d 1306, 1316 (10th Cir. 2008) (concluding that "when analyzing the substantive compliance of an IEP, the court should restrict our examination to the written document").  These Courts have arrived at this approach because the IDEA defines

7

an IEP as "a written statement for each child with a disability that is developed, reviewed and revised," 20 U.S.C. § 1414(d)(1)(A)(i), and the Supreme Court requires courts to focus on whether "the individualized education program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits[.]" *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982). Thus, "[t]aken together, the statutory definition of an IEP and the Court's command that the courts must focus the inquiry on the draft IEP as written." *Sytsema*, 538 F.3d at 1315.

The First Circuit has not adopted the so-called "four corners" rule and allows reviewers to consider evidence extrinsic to the written IEP at least when there are "obvious gaps" in the IEP. *Five Town*, 513 F.3d at 287. At the same time, the First Circuit noted that the purpose of the IEP is to present "a clear record of what placements and educational services were offered." *Id.* at 285. Here, the Magistrate Judge observed that while her "recommendation may be adjudged by the Court to involve application of a 'four corners' rule . . ., the focus of this recommendation is, more squarely, to enforce the IDEA's notice requirement and honor the collaborative process." *Rec. Dec.* at 42 n.22; *see Ms. M. v. Portland Sch. Comm.*, Civil No. 02-169-P-H, 2003 U.S. Dist. LEXIS 8552, at *54 (D. Me. May 20, 2003) ("[T]he IEP in effect [at the start of the school year] generally should be the one upon which a hearing officer or court should focus in assessing whether a student was provided [a free appropriate public education] FAPE").

Even though Surry strenuously argues that there are no restrictions on the scope of the hearing officer's statutory authority, the history of this case illustrates why compliance with the notice requirement and the use of the IEP as a focal point for the hearing officer's review are important. There were three Pupil Evaluation Team (PET) meetings in 2007: June 12, 2007,

June 21, 2007, and August 23, 2007. The June 12, 2007 PET meeting focused on placement at Mount Desert Island (MDI) High School and the participants agreed to use the Perkins IEP "as a starting point for the upcoming year." But, as the Magistrate Judge observed, "no suggestion was made of a Perkins placement and no question was directed to Perkins staff concerning the appropriateness of a Perkins placement." *Rec. Dec.* at 13. Although the possibility of a Perkins placement was discussed at the PET meeting of June 21, 2007, at the conclusion of the meeting Surry issued an IEP which stated that "[YRM] requires placement in a day treatment program such as Stillwater Academy." *Id.* at 14. There was discussion of a day treatment placement at either Stillwater or KidsPeace, but the possibility of a residential treatment placement at Perkins was not extensively discussed and was not recommended. *Id.* Magistrate Judge Kravchuk described the August 23, 2007 PET meeting as "a rather perfunctory affair." *Id.* at 19. Again, the discussion centered on KidsPeace, Stillwater, and the unsuitability of MDI High School; to the extent there was a decision, it was for a "day treatment program," which could not have included Perkins. *Id.* at 19-20. There is nothing in the record that suggests that the PET considered Perkins a legitimate placement option or that Surry formally offered Perkins as a placement option for the 2007-2008 school year. If it was Surry's intent to place YRM at Perkins, it should have complied with the notification requirements of 20 U.S.C. § 1415(c).

By failing to comply with § 1415(c) and to frame the issue for the Hearing Officer, Surry ran the risk that the hearing officer's determination would be beyond the current contemplation of the parties, but, more significantly, would be unsupported by the evidence. Here, despite the fact the parties, particularly Ms. Millay, focused their presentations on the appropriateness of day treatment programs, the hearing officer ordered a residential treatment program, and based his conclusion on questionable and unsubstantiated inferences. He found that YRM's failure to

adapt to the earlier Perkins placement was "due to Ms. Millay's failure to leave YRM at Perkins for a protracted initial stay in 2005" and that there was "no persuasive evidence presented as to the student's inability to be successful in the residential living situation." *Id.* at 23. Most disturbing, he transposed his experience with typical young teens to YRM, who is anything but typical, to suggest that YRM could better adjust to a residential treatment program: "All of us who have raised children know that there is a world of difference between an 11 year old and a 14 ½ year old". *Id.* at 23.

Even if Surry is correct that a hearing officer could legally draw a conclusion that the correct placement differs from the one the school noticed under § 1415(c), in this case, the hearing officer's decision is not supported by the evidence in this record or by his stated findings. He revived YRM's failure to adjust to Perkins in 2005, blamed it on YRM's parent, and recommended a residential placement at Perkins against the day treatment recommendations of the IEP; he placed a burden of proof on Ms. Millay to discredit a placement that was not the focus of the hearing; he drew from off-the-record personal experiences wholly inapplicable to YRM's case; and, he declined to review the other placements offered by Surry, which had been the subject of the IEP and which were the subject of the hearing. Surry concedes that the "Magistrate Judge could have concluded that the evidence did not support a more restrictive residential placement, as a substantive matter." *Def.'s Ob.* at 7. Even assuming that Surry is correct that there are no repercussions for its failure to comply with the notice provisions of the IDEA, the result has been a decision that is flawed on its merits.[3]

---

[3] The Court is disquieted about a number of aspects of the hearing officer's handling of this case. One example suffices. On January 8, 2008, the hearing officer held a pre-hearing conference and scheduled the hearing for January 22, 23, 25, 28, and 29 at the offices of the Department of Health and Human Services in Ellsworth. *Admin. Record* at H196 (*Admin. Rec.*). Following the setting of the hearing, Ms. Millay began to complain about the hearing dates on numerous grounds, ranging from child care problems to a lack of preparation time. *Id.* at H211, 227. She requested that a new hearing officer be assigned, a request that was denied. *Id.* at H216-17.

Perhaps, Ms. Millay's persistent objections to the scheduled hearing dates explain what happened next. On Monday, January 21, 2008, Ms. Millay wrote Maine Department of Education (DOE) and said that she had been to the doctor and had been ordered to rest for two days at a minimum with an illness "that could become very serious." *Id.* at H240. The hearing officer may have concluded that Ms. Millay was feigning illness to obtain a continuance, and as the hearing had been scheduled for some time and multiple witnesses had been subpoenaed, the hearing officer wrote Ms. Millay on January 21, 2008, asking her to fax him a copy of her doctor's order by 4 p.m. that afternoon. *Id.* at H253. The hearing officer emailed her again at 3:30, noting that he had received no response and asking again for a physician's order. On January 21, 2008, the hearing officer issued a scheduling order: "Having received no response to the e-mail messages sent earlier today, tomorrow's hearing will be held as currently scheduled and will begin at 9 AM in the offices of the Maine Department of Health and Human Services in Ellsworth, Maine." *Id.* at H266.

The next document is a letter dated January 22, 2008, which was hand-delivered to Ms. Millay on Wednesday, January 23, indicating that he had not heard from her and she had failed to appear at the scheduled hearing. He notified her that he was cancelling the hearing for January 22 and 23, but would proceed at 9:00 a.m. on Friday, January 25. *Id.* at H268, 269. On January 24, 2008, the hearing officer issued another scheduling order, noting that Ms Millay had requested a continuance for medical reasons, that she had not supplied a doctor's note, and that Surry objected to a continuance. *Id.* at H276. The hearing officer wrote that if Ms. Millay does not appear, he would "explore ways to provide [Ms. Millay] with an opportunity to both cross examine the school's witnesses and present her own witnesses, should she choose to participate in this proceeding." *Id.* He ordered her to produce signed written documentation from her doctor supporting her assertions that she was 'ordered to rest' and therefore could not attend the hearings scheduled for January 22, 23 and 25, 2009." *Id.*

By letter dated January 25, 2008, Ms. Millay wrote the Maine DOE, enclosing copies of her physician's notes. *Id.* at H278-29. She said she had returned from her appointment at 5:30 too late to mail the doctor's notes. *Id.* One doctor's note confirmed that she was suffering from "a febrile illness," that she had been advised to rest "for the next 48 h," and that she "may be contagious." *Id.* at H279. Another doctor's note dated January 24, 2008, said that the doctor recommended that Ms. Millay remain at home "for 48 – 72 hrs to recover from an acute illness." *Id.*

The hearing officer issued another scheduling memorandum on Sunday January 27, 2008, confirming that Ms. Millay failed to appear at the January 25, 2008 hearing, that it had gone on without her, and that Ms. Millay had not complied with the hearing officer's request for medical documentation. *Id.* at H280. He threatened to dismiss her case with prejudice. *Id.* Ms. Millay wrote to the hearing officer on Monday January 28, 2008 that she had "complied with your demand in every way possible: by email, telephone calls that you have not answered, and notes that I have sent (it was not possible to deliver a doctor's note to you in regard to my attendance on Friday after my second visit to the doctor, since it took place Thursday evening, but the note was mailed on Friday)." *Id.* at H283.

Ms. Millay wrote another letter on Tuesday, January 29, 2008, saying that she had not been able to respond earlier because she was "far too sick to copy and mail [the doctor's note] at the time I received it, due to high fever and symptoms of a quite serious nature." *Id.* at H284. This time she enclosed a third doctor's note dated January 29, 2008:

> To Whom It May Concern
>
> I evaluated and treated Mrs. Millay today for an ongoing viral upper respiratory illness and acute bronchitis. She had been seen by providers in my office now on three occasions due to the persistence and severity of her symptoms. It does appear that she is now suffering from acute bronchitis. She should not be over exerting herself, and her symptoms would preclude any productive participation in any formal meetings or committees.
>
> I have informed Mrs. Millay that her condition will likely take between two and four weeks for resolution, and I would not recommend scheduling any meetings earlier than 2 weeks from today.

*Id.* at H286. On January 30, 2008, Ms. Millay emailed the hearing officer, objecting to the fact that three days of hearings had been held without her, pointing out that even though the witnesses might be available for later cross-examination, she would have objected to one expert witness' testimony in its entirety. *Id.* at H288.

## 2.      Surry's Day Treatment Offer

On January 31, 2008, the hearing officer, having received the requested medical documentation, conceded that Surry, "has presented its case in chief and has rested."  He acknowledged that "[t]he student's mother has not attended any of the hearing days held to date, because of illness.  The hearing officer has, as of today, January 31, been provided with written medical documentation for all of those absences."  *Id.* at H290.  He granted a continuance to allow Ms. Millay to recover from her acute bronchitis and ordered a transcript of the hearing to date for her review.  *Id.*

The Court realizes this series of events was unusual.  In view of Ms. Millay's repeated attempts to continue the scheduled hearing, the hearing officer was within his rights to be skeptical and to demand medical documentation.  The record does not clarify why there was such a long gap in communication between January 21, 2008, when Ms. Millay first notified the hearing officer of her illness and January 30, 2008, when the hearing officer finally received medical documentation.  Ms. Millay is not blameless.  During this interval, she managed to make it to medical appointments in Blue Hill, and presumably she could have appeared at the scheduled hearing with the medical notes and appealed for a continuance.  As she in fact had acute bronchitis, her sick appearance should itself have been convincing.  She also failed to respond promptly to the increasingly urgent email notices and orders.  Finally, it is true that Ms. Millay tends to insist on punctiliousness when it comes to Surry, but to excuse her own failures as the result of self-representation.  Ms. Millay has demonstrated an unquestioned tenacity in pressing YRM's legal rights, and it would seem uncharacteristic of her not to even appear at the due process hearing involving her child.  Nevertheless, when Ms. Millay failed to appear at the hearing, the hearing officer allowed Surry to present its entire case over a three day period without the student being represented at all.

What is troubling is there is no suggestion that, other than sending emails, anyone attempted to personally contact Ms. Millay during this interval.  This is rural coastal Maine; Surry, where Ms. Millay lives, abuts Ellsworth, where the hearing was held, and she must live just a few miles away.  Instead of emailing demands and orders, it would seem that someone (other than the hearing officer) could have called or visited Ms. Millay to see if she was indeed ill.  Instead, the hearing officer assumed that she was misrepresenting her medical condition and ordered the hearing to proceed with only the school represented by counsel in attendance.

A hearing officer has the undoubted right to control the scheduling of an IDEA hearing.  At the same time, the First Circuit has characterized the hearing as a "due process hearing."  *Rose v. Yeaw*, 214 F.3d 206, 209 n.1 (1st Cir. 2000).  It is a statutory right with constitutional implications.  Under the IDEA, the parties are accorded "the right to present evidence and to confront, cross-examine, and compel the attendance of witnesses; the right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities; the right to a written, or at the option of the parents, electronic verbatim record of such hearing; and the right to a written or, at the option of the parents, electronic findings of fact and decisions."  *Id.* (citing 20 U.S.C. § 1415(h)).  The IDEA was enacted "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies."  *Id.* at 209 (citing 20 U.S.C. § 1415(a)).  In light of the significant rights at stake, even though the DOE, Surry, and their witnesses would have been significantly inconvenienced and even though the hearing officer continued the hearing for a couple of days, a sensible solution should have involved determining whether Ms. Millay was in fact as ill as she claimed, and if she was not, imposing a carefully devised sanction.

The history of this case confirms that Ms. Millay's *pro se* status complicates and occasionally frustrates the proceedings, and communication has been less than ideal.  Typically, a hearing officer could promptly establish whether an attorney or represented party seeking a continuance was truly ill, and, in representing her child, Ms. Millay must be held to the same standards as an attorney.  At the same time, the right to a FAPE rests not with the *pro se* parent, but with the child, and in sanctioning the parent, the presiding officer should strive not to penalize the student.  The sanction here turned out to be extreme.  As Ms. Millay was *pro se*, her illness and absence had the effect of making the interests of one side of the controversy wholly unrepresented during Surry's entire case-in-chief.

In the circumstances of this case, where the dispute between Surry and YRM has extended over many years, has involved multiple hearings, appeals, and court decisions, has proven intractable, and occasionally even bitter, for the hearing officer to hold three days of due process hearings with only one side present, knowing that Ms. Millay claimed that a serious illness prevented her attendance, borders on an abuse of discretion and runs counter to fundamental concepts of due process.

Asserting that the Magistrate Judge was "wrong on a number of fronts," Surry objects to the Magistrate Judge's recommendation to reject Surry's day treatment placement offer. *Def.'s Ob.* at 8. Surry contends that the Magistrate Judge's recommendations impose "procedural requirements that go above and beyond the IDEA," that she "wrongly confined her review of the FAPE issue to the information and discussion of YRM's needs that actually occurred at the team meeting, without any consideration at all of the voluminous information by distinguished experts on this topic presented to the hearing officer himself," and that "her ruling that Surry failed to have an IEP in effect at the start of the school year is not only wrong, but also failed to consider a host of equitable issues that strongly affect the conclusions to be drawn from any IDEA procedural error, including Ms. Millay's own adamant refusal to try any of the variety of placements offered to YRM," and that the Magistrate Judge failed "to address the absolutely central issue in this entire case – whether YRM's needs are so significant that she requires a therapeutic day treatment placement, or instead could be well served in a public school, life skills placement?" *Id.* at 8-9. The Court has thoroughly reviewed the Magistrate Judge's recommended decision and overrules Surry's objections for the reasons set forth in the decision.

### 3.    Maine Department of Education Jurisdiction

The Court carefully reviewed Surry's objection to the Magistrate Judge's conclusion as to whether the hearing officer had the authority to review a Maine Department of Education (DOE) corrective action plan. Surry is right as far as it goes: the hearing officer correctly ruled that the complaint process to enforce a corrective action plan is a matter for the state Attorney General. The Magistrate Judge did not say otherwise.

The Magistrate Judge's point was that the hearing officer failed to acknowledge that in addition to seeking a review (to which she was not entitled) as to whether Surry had complied

with the corrective action plan, Ms. Millay was also seeking a review as to whether Surry had complied with its obligation to provide YRM a free appropriate public education (a review she was entitled to receive).  *Rec. Dec.* at 30 (concluding that the hearing officer erred when he ruled that he could not provide Ms. Millay with a hearing related to the provision of a free appropriate public education).

If all that Ms. Millay had requested was a review of the corrective action plan, Surry's objection would be well taken, but when Ms. Millay filed a hearing request in 2007, she stated that "the District has failed . . . to implement [YRM's] current IEP covered by the complaint."[4] *Admin. Rec.* at H83.  When she received the issues delineated by the hearing officer, Ms. Millay objected, complaining that the hearing officer had omitted "[c]ompensatory education services from April 2006 until the date of full compliance for all services in the IEP ordered by the Maine [DOE] for the student."  *Admin. Rec.* at H208.  On January 16, 2007, Ms. Millay protested that [m]y concerns . . . were far more comprehensive than Surry or an ESY program . . . But, these concerns appear to have dis-appeared (sic) and only the district's concerns remain.  This give a strong appearance of bias since there is nothing left of my request for a due process hearing but the narrow issues that the school district later brought."  *Id.* at H219.

Thus, as the Magistrate Judge noted, "[a]lthough Ms. Millay may have sought relief tied to the findings of the Complaint Investigative Report, her hearing request clearly relates a

---

[4] In its objection, Surry argued that "Ms. Millay's Amended Complaint makes clear she is not seeking a FAPE ruling relating to the 2006-2007 year, but simply wants enforcement of a MDOE order with which she agrees.  The hearing officer properly rejected this issue."  *Def.'s Ob.* at 19.  This is simply incorrect.  Ms. Millay's Amended Complaint states in paragraph 7:

> Plaintiff brings this action to challenge an erroneous administrative decision concerning YRM's appropriate and least restrictive placement, <u>denying YRM compensatory services as the result of the school district's failure to provide YRM a Free Appropriate Public Education (FAPE) in the Least Restrictive Environment (LRE) from May 2006 through the present time, and to obtain reimbursement of costs, damages, and other appropriate relief.</u>

*Amend. Compl.* ¶ 7 (emphasis supplied).  The Court rejects Surry's contention on this point as inaccurate.

14

request to be heard on the denial of a [FAPE] 'during the time period covered by' the complaint that launched the MDOE investigation." *Rec. Dec.* at 28-29.  She concluded that "Ms. Millay's request for a due process hearing included an assertion that Surry had denied a [FAPE] to YRM in spring 2006, summer 2006, and fall 2006 through July 2007.  The hearing officer erred when he ruled that he could not provide Ms. Millay with a hearing related to the provision of a [FAPE] during these time periods simply because Ms. Millay had also stated that Surry had failed to comply with the corrective action plan specified in the Complaint Investigative Report."  *Rec. Dec.* at 30.

Reviewing Ms. Millay request, the hearing officer's decision, Ms. Millay's objection, the Amended Complaint, and the Magistrate Judge's recommendation, it is difficult to understand why Surry would press this objection.  The hearing officer was plainly wrong and the Magistrate Judge plainly right.

### 4.    Remedy

In her recommended decision, the Magistrate Judge recommended deferring the question of remedy to allow the parties to fully brief the issue. *Rec. Dec.* at 48-50.  She presented several reasons:  (1) the parties had not "truly briefed the issue," (2) Surry had made progress on supplying YRM a FAPE and "may well have had all of the pieces in place by 2008," (3) the proper remedy is interwoven with another pending action, (4) Ms. Millay has been requesting remedies neither she nor YRM is legally entitled to receive; and, (5) further hearings might be necessary.  *Id.*  Surry objects, saying that it "does not know how to respond to the remedial element of this Recommended Decision," since there "appears to be no real remedy ordered." *Def.'s Ob.* at 19.  Surry's objection is overruled.  The Magistrate Judge's recommendation for further proceedings on remedy is eminently sensible for the reasons she presented.

15

## II.     CONCLUSION

The Court AFFIRMS the Magistrate Judge's Recommended Decision for the reasons in the Recommended Decision and for the further reasons in this Order.  The Court VACATES the Hearing Officer's dismissal of Plaintiff Joanne M. Millay's claim that the Surry School Department denied YRM's right to a free appropriate public education as of the spring of 2006 and continuing through the 2006-2007 school year; the Court VACATES the hearing officer's decision dated June 20, 2008 in part and concludes that placement ordered by the Surry School Department in the 2007-2008 school year violated the Individuals with Disabilities Education Act, because the Surry School Department failed to have available a placement that could afford YRM a free appropriate public education at the beginning of the school year; the Court AFFIRMS that portion of the hearing officer's decision dated June 20, 2008, relating the 2007 ESY and concludes that the 2007 ESY program developed by the PET was appropriate under IDEA.  The Court GRANTS the Surry School Department's motion to dismiss Counts III and IV of the Plaintiff's Amended Complaint and to the extent Ms. Millay continues to press a civil rights claim under 42 U.S.C. § 1983, the Court GRANTS the Surry School Department's motion to dismiss that claim.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 21st day of April, 2010

16