UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

|                                          |     |                        |
| ---------------------------------------- | --- | ---------------------- |
| JOANNE M. MILLAY, *as Parent of*         | )   |                        |
| *minor child Y.M.,*                      | )   |                        |
|                                          | )   |                        |
|     Plaintiff        | )   |                        |
|                                          | )   |                        |
| v.                                       | )   | No. 1:07-cv-00178-JAW  |
|                                          | )   |                        |
| SURRY SCHOOL DEPARTMENT,                 | )   |                        |
|                                          | )   |                        |
|     Defendant        | )   |                        |

AMENDED[1] REPORT AND RECOMMENDATION CONCERNING REMEDY

Presently before the Court is a dispute over the remedy the Court should award to

Plaintiff Joanne M. Millay for the educational benefit of her minor child, Y.M., based on

Defendant Surry School Department's denial of a free appropriate public education to Y.M. in

the 2006-2007 school year and through all or part of the 2007-2008 school year. The parties

agree that the dispute involves two issues: (1) how to quantify the amount of educational

programming Y.M. lost due to the Defendant's violations and (2) how to remediate this loss and

deliver compensatory education services to Y.M. Plaintiff requests that the Court order

Defendant to establish and fund a trust that will enable her to purchase compensatory educational

services for Y.M. in a community setting, without having to remain within the strictures of a

formal school setting or even a school-controlled IEP framework. Defendant requests that the

Court order an extension of traditional IEP benefits beyond the expiration of Y.M.'s ordinary

---

[1]     This amended Report and Recommendation addresses a computational error in the original at page 28 and in footnote 10. There, it was stated that the programming loss in the 2007-2008 school year amounted to 72 weeks. Obviously, that was error.

eligibility. Defendant also requests that the Court exclude certain supplemental evidence offered by Plaintiff in support of her position on remedy.

The Court referred these matters for report and recommendation pursuant to 28 U.S.C. § 636. The motion to exclude is granted-in-part and denied-in-part, for reasons set out in the description of the supplemental record. The remedy discussion offers a recommendation of 86 weeks of compensatory education, with Defendant remaining responsible for IEP development, placement, and funding, unless the Maine Department of Education appoints a substitute decision maker with expertise to fulfill Defendant's IDEA obligations. The order should leave the parties with a full range of options to consider with respect to future program services and placement and should not restrict the boundaries of future program options, including, potentially, a "community-based" program designed to overlap with adult services.

## SUPPLEMENTAL RECORD

On April 23, 2010, following the Court's April 21 order on the merits, I issued an order governing the briefing cycle on the issue of remedy. That order permitted the parties to supplement the record to support their respective positions. (Report of Tel. Conf. and Order Re. Briefing Schedule on Issue of Remedy, Doc. No. 159.) I approved Plaintiff's request to submit the following materials: (1) a professional evaluation concerning alleged developmental regression and how to remedy any regression; (2) affidavits and other documentation reflecting the value (cost) of compensatory programming; and (3) other relevant professional evaluations of the student. (Id. at 2.) I also approved Defendant's request to submit: (1) a "Record of Compliance" with the Maine Department of Education's Corrective Action Plan; (2) affidavits and other documentation reflecting the value of compensatory programming; and (3) relevant professional evaluations of the student. (Id.) The parties duly filed their supplemental materials,

described below.  Defendant has raised objections to some materials offered by Plaintiff.  Those objections are also addressed below.  In addition to the materials voluntarily submitted by the parties, on March 10, 2011, I ordered the parties to file a stipulation that would enable the Court to determine the start and end dates of the school calendars in each of the years in question.  The parties filed such a stipulation, attaching the school calendars for each year.  (Doc. No. 195.)

## A.      Defendant's Supplemental Materials

Defendant filed its supplemental materials at the end of July 2010 and the materials were modified by leave of Court in early August.  (Doc. Nos. 161-162.)  The primary exhibit is an Affidavit of Susan Parks, with a substantial attachment.  (Doc. No. 162, supplemented at Doc. No. 166.)  The Parks Affidavit attaches a "record of compliance with the Maine Department of Education's Corrective Action Plan."  (Doc. No. 162-2 (sealed).)  Ms. Parks is an employee of the Maine Department of Education within the Division of Special Services and serves as a Due Process Consultant.  One of her responsibilities is to monitor compliance with remedial action plans.  (Doc. No. 162-1.)  She has attached to her affidavit a bundle of documents she maintains to monitor Defendant's compliance with the Corrective Action Plan.  She reports that compliance with the Plan "is considered sufficient by the Department of Education as a remedy for the violations found by the Maine Department of Education through the complaint investigation process."  (Id. ¶ 3.)

Defendant argues that the Court should fashion its remedy to be coextensive with the Corrective Action Plan of the Department of Education.  (Def.'s Br. at 7.)  The Corrective Action Plan contains one provision, in particular, that deserves quotation.  It is not clear from this provision that the Department of Education's Corrective Action Plan requires compensatory education consisting of an extension of Y.M.'s eligibility.

> 9. Due to the practical realities of this Student and her family and the intensive instructional program the Student requires during the school year and in the summer, the provision of equitable compensatory educational services for her to remediate the loss of services for the period from September 22, 2006 to the date of her placement in a special education instruction program cannot be achieved by calculating the actual number of hours or days of services lost. The P.E.T. shall determine how compensatory educational services will be provided to the Student over the next school year on non-instructional days such as school vacations, holidays and weekends. The team shall focus its discussion and determinations about compensatory educational services on the Student's most significant needs.

(Doc. No. 162-2, Bates # 68.) Notwithstanding the foregoing provision, or perhaps pursuant to it, Defendant reports that it has offered to extend IEP services for an additional year to provide compensatory educational services for the 2006-2007 school year and that the IEP Team supported this proposal. (Def.'s Br. at 8, bullet 9; citing Doc. No. 162-2: Sept. 17, 2007, Letter from Eric Herlan to Diane Smith, Bates # 511; Feb. 6, 2009, Letter from Eric Herlan to Susan Parks, Bates ## 527-28; Dec. 24, 2008, Written Notice, Bates ## 530, ¶ 1.E.) Plaintiff has never assented to this offer.

The other evidentiary supplements offered by Defendant are two affidavits addressed to the issue of how the Court might compute a daily or weekly rate or cost for special education services. (Aff. of Nancy Connolly, Doc. No. 161-1; Aff. of Susan Dickinson, Doc. No. 161-2.) The latter affidavit offers an accounting of the cost of delivery of Y.M.'s educational program at Bangor High School for the 2009-2010 school year: $106,171.41.[2] (Aff. of Susan Dickinson ¶¶ 5-6 & Ex. A.)

## B.    Plaintiff's Supplemental Materials

Like Defendant, Plaintiff filed a bundle of documents in paper format. (Doc. No. 165.) Her collection consists of: two 2010 reports from Dr. Anthony Podraza; one 2010 report from

---

[2]    Y.M. did not attend in June 2010, so there is a small projection involved in this computation. Note that over $35,000 of this sum is for transportation expenses. (Aff. of Susan Dickinson, Ex. A.)

Dr. Mary Talbot Fox; four reports from Dr. Royal Grueneich spanning a ten-year period between 2001 and 2010; two 2010 letters from Jeffrey Jones; a 2002 decision by a due process hearing officer; an affidavit from Plaintiff attaching receipts; correspondence Plaintiff has sent to Defendant and the Maine Department of Education; and a letter from Acadia Bank and Trust. In addition to this collection of documents, Plaintiff has filed an affidavit from Dr. Podraza (Doc. No. 178) and an affidavit from Mr. Jones (Doc. No. 179).

Defendant promptly filed a motion to exclude, arguing that some of the materials are beyond the scope of what was authorized for supplemental filings and also raising foundation challenges and other challenges to views expressed by some of the consultants. (Def.'s Mot. to Exclude, Doc. No. 167.) The content of Plaintiff's submissions is set forth here and the motion to exclude is addressed in the subsequent section.

1.  *Dr. Podraza*

Plaintiff has filed multiple materials from Dr. Podraza. Dr. Podraza is a licensed psychologist, board certified in clinical neuropsychology. The materials include "to whom it may concern" letters Dr. Podraza authored to influence IEP proceedings and school administration decision in 2007 and also in 2010, while Y.M. was attending Bangor High School. In a January 2, 2007, letter of this kind, Dr. Podraza described Surry Elementary as an "educational setting where [Y.M.] was clearly emotionally and physically traumatized by the lack of appropriate special education and support services." (Jan. 2, 2007, Podraza Letter, Doc. No. 165.) In a July 29, 2010, letter, Dr. Podraza summarized the educational history, related that he was asked to address the issue of regression, and offered the following opinion: "Given the fact that [Y.M.] is much older and had a difficult school year this past year at Bangor High School, I believe that it might take her at least one year to get used to trusting adults and going to

school again on a full-time basis." (July 29, 2010, Podraza Letter, Doc. No. 165.) Dr. Podraza did not articulate the basis for his opinion that Y.M. was emotionally and physically traumatized at, or by, Surry Elementary.

This group of materials also includes a "psychology consult" note about increased incidents of self-injurious behaviors while Y.M. was at Bangor High School. (June 16, 2010, Podraza Consult, Doc. No. 165.)

Plaintiff has since filed an affidavit from Dr. Podraza. The affidavit relates two opinions:

8. It is my opinion, based on my review of YRM's records and my independent knowledge of her needs, that she will require at least as much time to make up lost educational services as she was deprived of them, however many hours of service the court determines that to be.

9. In addition, YRM has a history of negative experiences involving adults in a school setting and of being outside of a regular school routine. As a result, she will require additional time, of possibly up to a year, to adapt to school routine and to develop trusting relationships with school staff before she will be able to make progress toward her educational goals. This is my opinion on the degree of regression she has experienced.

(Doc. No. 178 ¶¶ 8-9.)

   *2.    Dr. Talbot Fox*

Dr. Talbot Fox has provided a "to whom it may concern" letter signed under penalty of perjury. She relates that Plaintiff asked her to provide an opinion "with regard to the preferred way of providing compensatory services to [Y.M.] for the loss of programs and services." (July 28, 2010, Talbot Fox Letter, p.1., Doc. No. 165.) Dr. Talbot Fox recites her concern that there is high risk of regression when students with such complex needs go without services for a period of months or longer. She identifies the services that Y.M. did not receive and could have benefitted from. She opines that Y.M. could continue to develop in an appropriate school environment and could also adapt to a school routine. She recommends that this take place

during Y.M.'s remaining years of school eligibility. However, despite this opinion, Dr. Talbot Fox also advocates a remedy that would involve a fund to purchase compensatory services after Y.M. ages out of school and enters her adult living situation. (Id. p. 2.) Dr. Talbot Fox outlines "some potential uses of compensatory funds to aid in effective transition and programming," essentially a list of the consultant services the Court is familiar with from the merits dispute. Dr. Talbot Fox does not describe regression as a significant factor.

3. *Dr. Grueneich*

Plaintiff has filed a notarized letter from Royal Grueneich, Ph.D., Clinical Neuropsychologist, attaching four neuropsychological evaluations performed over the years, most recently in April 2010. (July 22, 2010, Letter from Royal Grueneich, Ph.D., to Joanne Millay, with attachments, Doc. No. 165.) In short, Dr. Grueneich states in his cover letter that Plaintiff asked him to offer an opinion on remedy and regression and that, "at a minimum," the remedy "should involve provision of services for a duration which is at least equal to the time which she has lost." (Id.)

4. *Jeff Jones*

Plaintiff has filed three "to whom it may concern" letters from Jeff Jones, Blindness Rehabilitation Specialist, who offers his comments "with the knowledge of perjury." He relates that the daily rate of services at Perkins School for the Blind, for Y.M., would be $1,292.72 per day, but that approximately a third of this rate is for residential services. (July 23 and 26, 2010, Letters from Jeff Jones, Doc. No. 165.) Mr. Jones also relates some recommendations about the daily living skills, behavioral modification, and adaptive communication services that Y.M. should receive. He attaches a 2001 evaluation performed by Charlotte Cushman, M.Ed., Educational Consultant for Catholic Charities of Maine. Ms. Cushman offered a number of

recommendations concerning school program structure in the 2001 timeframe, when Y.M. was seven and attended Surry Elementary School. (June 15, 2010, Letter from Jeff Jones, attaching March 2001 Cushman Consultation Summary, Doc. No. 165.)

5. *Plaintiff's affidavit*

Plaintiff has also filed a five-page, single-spaced affidavit, signed under penalty of perjury and notarized. Among other statements, Plaintiff states that she had attempted to arrange a home- and community-based program for Y.M. beginning in the 2006 timeframe, but Defendant refused to assist in such an approach to programming. (Millay Aff. ¶ 6, Doc. No. 165.) She attests: "Using family funds, I purchased augmentative communication devices and other educational materials and spent many hours with [Y.M.], while her siblings attended school and while I normally would have been employed." (Id. ¶ 7.) She states that during this time Y.M. became depressed and made no progress overall, other than in regard to independent living skills. (Id. ¶ 8.) Relying on day habilitation services from UCP, Millay was able to ensure that Y.M. would "lose less ground" as compared to what she might otherwise have achieved in an appropriate program. (Id. ¶ 10.) According to Millay, the December 2008 IEP Team meeting that took up the issue of compensatory education was scheduled for a date she could not attend and her request for other dates was ignored. (Id. ¶ 11.) She states that the eventual offer of one year of compensatory education is insufficient for "three semesters" of deprivation. (Id. ¶ 13.) She states that this would also fail to remediate "extreme regression." (Id. ¶ 16.) She maintains that Y.M.'s "failure to make progress (though our interventions apparently prevented some regression in at least some areas, if not actual progress . . .) cannot be fully recovered." (Id. ¶ 19.) She believes it will take "further years before [Y.M.] begins to be able even to benefit from participation in a full-time education program." (Id. ¶ 20.) Moreover, she does not wish for

8

Defendant to play a role in providing compensatory education: "I believe that additional years of eligibility will not meet YRM's needs . . . and there is also little to assure that this school district will fulfill any future directive." (Id. ¶ 25.) She does not wish for Y.M. to forego adult services in order to attend a school-based program, reports that she is too old and unwell to continue with the IEP process, and states that the family may move out of Maine by the time compensatory education would be provided. (Id. ¶ 26.) For these reasons, she requests that the Court order the establishment of a trust fund so she can make sure Y.M. obtains the educational services she needs in the future. (Id. ¶ 27.) She reports that Acadia Trust recommends that a "neutral attorney" serve as trustee. (Id. ¶ 28.) She outlines approximately 15 different kinds of service providers that would be appropriate recipients of trust funds. (Id. ¶ 29.)

Although Plaintiff "is aware that the IDEA has no remedy for the loss of parental time and attention to other family members, and for the loss of income," she seeks "reimbursement for [her] time in providing the actual 'stay-put' program" and says "compensation should be measured as a full-time occupation at $32,000 per 40 weeks."[3] (Id. ¶ 23.) In addition, she requests reimbursement of the costs of litigation and attaches receipts for her outlays in this litigation. (Id.; Attached Cost Exhibits.)

6.      *2002 due process decision*

This document is an earlier due process hearing officer decision concerning the extended school year services Defendant provided to Y.M. in the summer of 2002. The hearing officer found a violation based on Defendant's decision to scale back the ESY program to three days per week rather than five. The hearing officer ordered a four-day program, a compromise between

---

[3]      Plaintiff does not explain what all the sources of her household income are.

Defendant's position and Plaintiff's demand for a five-day program.  (July 2, 2002, Carol B. Lenna, Due Process Hr'g Dec., Doc. No. 165.)

### 7. *Plaintiff's Correspondence*

According to Plaintiff, these documents complete the picture offered by Defendant in its 500-plus page production of a Corrective Action Plan "compliance record."  In the main, they are advocacy letters sent by Plaintiff to Defendant and the Maine Department of Education and their personnel.  The earliest correspondence is dated May 30, 2007;  the latest February 20, 2009.

### 8. *Acadia Bank and Trust*

Plaintiff has included a letter from a portfolio manager at Acadia Trust, indicating that the bank would be happy to manage a trust fund for Y.M.'s educational benefit.  (July 29, 2010, Letter from Brenda Gatcomb to Joanne Millay, Doc. No. 165.)

## C. Motion to Exclude

Defendant was not satisfied to present challenges to Plaintiff's supplemental presentation on the basis of weight, and has filed a formal motion to exclude (Doc. No. 167).  These challenges are addressed seriatim.

### 1. *Dr. Podraza*

Defendant complains that Dr. Podraza's materials do not set forth a good foundation for his opinions, such as a recent evaluation, and are therefore subject to exclusion because they are unfairly prejudicial per Rule 403 and unreliable per Rule 702 of the Federal Rules of Evidence. Defendant is skeptical of Dr. Podraza's opinion, as well, because he merely says Y.M. "might" take a year to adjust to adults and return to school on a full-time basis.  Defendant also objects that this does not fall into the limited categories of supplemental evidence that were authorized. (Mot. to Exclude at 2-4.)  As for the June 2010 consult about self-injurious behaviors at Bangor

High School, Defendant objects that the content is not even relevant. Defendant also objects on foundational grounds because it appears that Dr. Podraza simply accepted whatever Plaintiff told him and did not engage in any kind of independent investigation. (Id. at 4-5.) Defendant is correct that the June 2010 consult does not advance any of the remaining issues in this case and was not an authorized filing. That document is stricken. However, given the submission of the Podraza Affidavit, in which Dr. Podraza attests to his review of the evaluative records, and based on his long-standing association with this matter, the remaining letters are appropriately considered in the context of judicial review of agency action. Defendant's challenges to the views expressed therein raise legitimate issues as to weight, but not admissibility.

*2.    Dr. Talbot Fox*

Defendant raises similar objections to the views expressed by Dr. Talbot Fox. (Id. at 5.) The Court is abundantly familiar with Dr. Talbot Fox's association with Y.M.'s educational needs and Defendant's challenges are more appropriately addressed as concerns over the weight of the evidence rather than admissibility.

*3.    Dr. Grueneich*

Defendant does not object to the introduction of Dr. Grueneich's reports. (Id. at 8.)

*4.    Jeff Jones*

Defendant objects to the idea that Mr. Jones is the proper witness to provide the Court with information about the costs of services at Perkins School for the Blind. Additionally, Defendant complains that the cost for programming at Perkins has no logical correlation to what services might cost in Maine. (Id. at 7.) By way of affidavit, Mr. Jones explains that his work makes him well aware of the costs of programming at Perkins, as it is "the only regional resource for students with YRM's needs." He explains that his hope is merely to provide the Court with

"an appropriate comparator for the purpose of developing a compensatory remedy for YRM." (Jones Aff. ¶ 4, Doc. No. 179.)  The Jones exhibits are not stricken, though they are of limited weight insofar as neither party is proposing enrollment at Perkins.  They do, however, supply meaningful information about the considerable amount of money Defendant has been willing to spend to provide Y.M. with what the parties describe as the gold standard for instruction of blind students.  Whether federal IDEA dollars are being expended prudently is beyond the scope of this dispute—the gold standard is not the measure of a free appropriate public education—but this information might have some relevance in the context of an equitable assessment.

     5.     *Plaintiff's affidavit*

Defendant is willing to take issue with Plaintiff's representations in the context of its substantive brief on remedy, but says it "must object" to the extent Plaintiff suggests that she is a special education expert with special insight into the issue of educational regression.  (Mot. to Exclude at 8.)  The Court can receive and consider some of Plaintiff's testimony as lay witness opinion testimony.  Fed. R. Evid. 701.  Moreover, to the extent Plaintiff's testimony blurs the lines between what is permissible lay opinion versus expert opinion, the Court will be able to sort this out pragmatically, without trying to draw hard and fast lines on an evidentiary ruling.  Certainly, a mother can offer reliable information about her child's development.  Moreover, Plaintiff has a background in special education and considerable experience caring for disabled children.  The Federal Rules are not blind to the fact that expertise is often gained by practical experience.  Fed. R. Evid. 702.  Special education expertise is not restricted to individuals with advanced degrees.

## 6. *2002 due process decision*

Defendant objects to this decision, arguing that it is not probative of any issue before the Court at this time. (Mot. to Exclude at 9.) Plaintiff says that the decision demonstrates that regression has been a serious matter in the past. (Pl.'s Response to Mot. to Exclude at 5, Doc. No. 174.) The decision reflects that a due process hearing officer found that regression might result during an ESY program if it consisted of only three days of instruction per week rather than four. This exhibit is not within any of the categories of authorized supplementation. Moreover, it is not probative of the existence of regression subsequent to Y.M.'s withdrawal from school. It is excluded for those reasons.

## 7. *Plaintiff's correspondence*

Defendant objects to the introduction of these letters and e-mails because they are not within the categories of authorized supplementation and because they are offered simply to "reiterate the many allegations of misconduct Ms. Millay has asserted throughout this proceeding." (Mot. to Exclude at 9.) Plaintiff states that the documents in question are part of the file that Ms. Parks should have maintained in connection with Defendant's compliance with the Corrective Action Plan. She notes that Ms. Parks's affidavit alludes to the fact that some documents were left out of the 500-plus page supplementation offered by Defendant on the issue of compliance. (Pl.'s Response to Mot. to Exclude at 6-9.) The order respecting authorized supplementation allowed Defendant to submit a record of compliance. Defendant did so, but edited the production to leave out some of Plaintiff's correspondence. Defendant's voluminous production opened the door to this kind of submission. These documents are not excluded. However, it is telling that Plaintiff fails to incorporate them into her substantive brief on the issue

of remedy. Her position, in fact, is that compliance with the Corrective Action Plan is irrelevant to the issue of remedy. (Pl.'s Response to Def.'s Mem. on Issue of Remedy at 6, Doc. No. 176.)

8. *Acadia Bank and Trust*

Defendant raises hearsay and relevance objections. The Defendant also notes that this item is not within any of the categories of authorized supplementation. (Mot. to Exclude at 6.) This letter is excluded. Should the Court decide to issue an award involving a trust fund, it has the means at its disposal to identify a suitable institution to manage the fund or can reopen the record for that limited purpose.

### DISCUSSION OF REMEDY

Plaintiff argues that a trust fund is the only way to reliably make up for Y.M.'s extended loss of educational services. Defendant disputes this contention and asks that the Court resolve the matter with an award of a specific period of compensatory education. Part A of this discussion sets forth the law respecting traditional IDEA remedies. Part B discusses the prospect of fashioning an equitable remedy in the form of a trust fund with court-ordered guidelines for future expenditures and advises against that approach on the facts of this case. Part C addresses the question of "regression" and offers a finding that the record demonstrates a lack of progress rather than regression. Part D offers a calculation of 86 weeks of programming lost on account of Defendant's violations and Part E recommends that the Court order compensatory educational services for a corresponding amount of time, to be provided after Y.M. would otherwise age out of the special education system. Finally, in Part F it is recommended that the Court deny Plaintiff's request for a monetary award measured in terms of a fee or salary for the home-based services Plaintiff provided for Y.M., and advises that the Court direct Plaintiff to submit her litigation cost exhibits in a bill of costs submitted pursuant to Local Rule 54.3.

14

**A.    The Traditional Compensatory Education Remedy**

The IDEA permits a court to "grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  Relief ordered pursuant to the IDEA should be designed to ensure a free appropriate public education, not to compensate a personal injury.  Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 125 (1st Cir. 2003).  A common remedy is an order requiring a period of compensatory educational services designed to compensate for past deprivations.  Me. Sch. Admin. Dist. No. 35 v. R., 321 F.3d 9, 17-18 (1st Cir. 2003);  Pihl v. Mass. Dep't of Educ., 9 F.3d 184, 188-89 (1st Cir. 1993).

"[T]ort-like money damages . . . are not available under the IDEA."  Nieves-Marquez, 353 F.3d at 124.  However, monetary relief can be awarded as a component of an equitable remedy.  Id.  For example, "reimbursement of private educational expenses," id. at 125, is often awarded to make a school district "belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP," Sch. Comm. of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 370-71 (1985).  Such a remedy is particularly appropriate when the school district has failed to provide a free appropriate public education but the family has enrolled the child in an appropriate private program at its own expense.  Id.;  see also Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993) (observing that a family's unilateral change of a child's placement is done at the family's financial risk and reimbursement requires both an inappropriate public program *and* an appropriate private placement).

In this case, the child has received services from United Cerebral Palsy and certain individual providers in the home and community during the period of the IDEA violation.  However, those services did not rise to the level of an "appropriate" individualized educational

program in a private setting. Nor has Ms. Millay demonstrated that she paid for these services.

In this scenario, the default remedy is a compensatory education remedy. "Compensatory

education is a surrogate for the warranted education that a disabled child may have missed

during periods when his IEP was so inappropriate that he was effectively denied a FAPE." C.G.

v. Five Town Community Sch. Dist., 53 F.3d 279, 290 (1st Cir. 2008). "[C]ompensatory

education is not an automatic entitlement but, rather, a discretionary remedy for nonfeasance or

misfeasance in connection with a school system's obligations under the IDEA." Id. As a

discretionary equitable remedy, the extent of a compensatory education award is very dependent

on the particular facts and circumstances of the case.

> The nature and extent of compensatory education services which federal courts
> have recognized varies according to the facts and circumstances of a given case.
> Such an award may include extra assistance in the form of tutoring, or summer
> school while students are still within the age of entitlement for regular services
> under the Act, or an extended period of assistance beyond the statutory age of
> entitlement.

Pihl, 9 F.3d at 188 n.8 (citations omitted). Compensatory education serves to replace the

"educational services the child should have received in the first place" and "should aim to place

disabled children in the same position they would have occupied but for the school district's

violations of IDEA." Reid v. District of Columbia, 401 F.3d 516, 518 (D.C. Cir. 2005). The

Court must base its remedy on the preponderance of the evidence. 20 U.S.C. §

1415(i)(2)(C)(iii). "In fashioning discretionary equitable relief under the IDEA, a court must

'consider all relevant factors.'" Ferren C. v. Sch. Dist. of Philadelphia, 612 F.3d 712, 718 (3d

Cir. 2010) (quoting Carter, 510 U.S. at 16). However, "there is no obligation to provide a day-

for-day compensation for time missed." Park v. Anaheim Union High Sch. Dist., 464 F.3d 1025,

1034 (9th Cir. 2006); see also Bd. of Educ. of Fayette County v. L.M., 478 F.3d 307, 316 (6th Cir. 2007) (same).

**B.      Plaintiff's Educational Trust Fund Proposal**

Plaintiff requests that the Court direct Defendant to fund a trust for the acquisition of future educational services "in the community" to supplement the adult services Y.M. will be entitled to receive when she ages out of her public education rights.  Plaintiff wishes to be free of any administrative entanglement with the Surry School Department insofar as delivery of Y.M.'s compensatory education is concerned.  According to her:  "There is nothing at all new about compensatory education trust funds."  (Pl.'s Mot. at 13, Doc. No. 171.)  She proposes that the Court determine the number of weeks of lost programming time, figure out the weekly cost of program delivery in a community setting (based on rather meager evidence), compute a subtotal, and then factor in a penal multiplier to account for "regression."  (Id. at 6-8,14-16.)[4]

Decisional law is not that notable on the issue of educational trust funds.  Courts have considered the issue with mixed results.  Plaintiff relies primarily on Ferren C. v. School District of Philadelphia, 612 F.3d 712 (3d Cir. 2010).  However, in Ferren, the Third Circuit affirmed a district court decision rejecting a local education agency's (LEA) establishment of a trust fund for three years of compensatory education to be delivered by a private school, where the LEA refused to continue serving as the IEP administrator in those years.  The Third Circuit agreed with the district court that it was appropriate to order the LEA to maintain its IDEA obligations throughout the period of compensatory education, regardless of the fact that the student has aged out of her IDEA eligibility.  Id. at 715-16.  The Third Circuit did not merely hold that the district

---

[4]      Note, however, that Plaintiff states in her response to Defendant's memorandum on remedy that Y.M.'s needs should be evaluated when she ages out of special education, and that a "wooden formula" cannot be applied to calculate the scope of compensatory education.  (Pl.'s Response to Def.'s Mem. on Issue of Remedy at 7.)

court had acted within its discretion. Its analysis was that the district court's resolution was clearly the right approach. In the panel's words: "Allowing the School District to refuse to provide IEPs and to simply fund Ferren's compensatory education would undoubtedly further hamper Ferren's education and deprive her of her educational rights under the IDEA." Id. at 719. According to the Court: "a 'money-only' type of award . . . is exactly the type of empty victory that the Supreme Court sought to avoid in Burlington[.]" Id. at 719-20 (citation omitted). In the Third Circuit's view:

> If an individual was deprived of his or her right to an adequate FAPE, and by extension an IEP, prior to the age of twenty-one, it follows that the student could only be fully compensated by an award of compensatory education that contains the elements of a FAPE that she was previously denied. . . . In certain cases, such as the one here, monetary awards can not fully compensate a student for a school district's past failures.

Id. at 720. Although the Third Circuit did not rule out different approaches in different cases, id., it recognized that ensuring IEP development is an obligation essential to the delivery of a free appropriate public education and that it is not a simple matter to disconnect the LEA (or a substitute agency of the state) from this obligation and still fulfill the objectives of the IDEA.

Plaintiff regards the Ferren opinion as a favorable precedent because there was no judicial questioning of the appropriateness of setting money aside in a trust fund. (Pl.'s Mem. at 13-14.) It is true that neither the district court nor the Third Circuit raised an objection to the LEA's decision to establish a trust to pay for future tuition costs at a private institution.[5] However, it would be a different matter to order an LEA to establish a trust for a family to draw upon when and how it sees fit, provided only that it select from a predetermined list of

---

[5]    The appearance in Ferren is that the LEA established the trust in order to dissociate itself from the child's programming, not in the spirit of ensuring a free appropriate public education.  See Ferren C. v. Sch. Dist. of Philadelphia, 595 F. Supp. 2d 566, 579 (E.D. Pa. 2009) ("We have little sympathy for the School District's request that we limit its involvement to the role of a banker for her three years of compensatory education.").

community-based service providers.  That model has little resemblance to an individualized educational program administered in either a private or public school setting.

A decision out of the Eastern District of California demonstrates that a trust fund for "open market" solutions can work effectively, albeit in a rather narrow situation.  In <u>J.C. v. Vacaville Unified School District</u>, No. Civ. S-05-0092 FCD KJM, 2006 U.S. Dist. Lexis 65710, 2006 WL 2644897 (E.D. Cal. Sept. 14, 2006), the court awarded an IDEA remedy consisting of a trust fund to pay for IEP services in the market.  However, in the <u>Vacaville</u> case the parties essentially stipulated that the student was entitled to a number of hours of autism-related services from a particular provider.  2006 U.S. Dist. Lexis 65710, *3-*5.  The hearing officer awarded direct instruction outside the regular school day by a private provider of autism educational services.  <u>Id.</u> at *7.  Subsequently, the child's family moved outside of the LEA's area.  In their complaint for judicial review, the family requested that the Court determine the cash value of the services the student was entitled to and order the LEA to establish and fund a trust so the family could purchase autism services directly in the family's new setting.  <u>Id.</u> at *8-*9, *18.  The <u>Vacaville</u> Court did not question the appropriateness of a trust.  However, the facts reflect that there was a single provider—a service provider that was already providing services to the child in his new school—and that the compensatory package of after-school services would involve the purchase of additional hours of services from the same provider, but at a pace that would depend on the student's ability to endure extended-day services.  <u>Id.</u> at *24-*25.  In effect, there was a solitary provider and a number of hours of contract services that the child was entitled to recover, but the schedule at which the child would be able to consume the compensatory, after-school services could not be predetermined.

The circumstances in the <u>Vacaville</u> case presented a much tidier service picture than the one existing in the instant case, which involves multiple services providers and an underlying IEP that called for an integrated delivery model. Trying to both grant and meaningfully restrict Plaintiff's autonomy to select from multiple services and multiple service providers in the community would set the Court up as a potential administrator and could lead to perpetual requests for judicial intervention on an *ad hoc* basis. Perhaps the most problematic aspect of Plaintiff's request is that it largely directs a placement decision and an IEP menu of services. This would place the Court precisely in a position it should not occupy—the position of setting educational policy and dictating future programming decisions. Placement and IEP issues should remain with the IEP team that has already devoted so much time to this student. To date, Y.M.'s IEP team has developed an integrated IEP that calls for a coordinated delivery system. It would not be appropriate for the Court to direct a remedy that would require an *a la carte* delivery model as of the date that Y.M. ages out of educational services.[6] Moreover, Defendant already bears the financial responsibility for IEP development and delivery. Ordering the establishment of a trust would introduce one more administrative challenge without any obvious benefit other than giving Plaintiff the freedom to develop her own delivery model. The establishment of a trust in this particular scenario could also complicate any future legal disputes. Unfortunately, the potential for future legal disputes cannot be disregarded here unless Plaintiff

---

[6]     In Plaintiff's view, once Y.M.'s "IDEA eligibility" ends, the funds "could be spent, through the trustee, on specific service categories as delineated in the order, in an amount and at a rate determined by an evaluation that would occur after her 20th birthday." (Pl.'s Mem. at 16; <u>see also id.</u> n.16 (purporting to delineate the menu of services).) It would appear that Plaintiff would like for the IEP team to play no future role and for the Court to condone future expenditures provided they go to services preauthorized by the Court. This does not strike me as an appropriate use of limited public education dollars. Nor does it set up an appropriate administrative hierarchy. It is not difficult to imagine future petitions to modify the Court's order to allow for payment toward new or alternative services. This would place the Court first in the administrative chain rather than in the position of conducting judicial review following local administrative and state due process measures. The Court should avoid placing itself in such a position.

is given wide latitude as to which service providers will be utilized and on what schedule. That kind of delivery model is not what is contemplated in the IDEA.

In addition to the foregoing hazards, the establishment of a trust would require Defendant to tie up money that otherwise might never be expended, depending on future events. Defendant's obligation is to develop and make available a free appropriate public education. If it complies with the IDEA and Plaintiff nevertheless refuses to accept what is offered, there would be no cause to have a large sum of money (Plaintiff proposes in excess of $650,000) locked up in a trust that would require judicial intervention and third-party proceedings to dissolve. In sum, the establishment of a trust will not likely simplify the process of developing and implementing an IEP for Y.M. that affords a free appropriate public education.[7]

## C.     Regression

Plaintiff says that any compensatory education award must be enhanced to address educational regression. (Id. at 8-13.) However, her presentation does not support a finding of regression. Thanks to the services of UCP, Y.M. continued to receive support services during her absence from school. The expert opinion evidence that Plaintiff highlights in her brief (Drs. Talbot Fox, Grueneich, and Podraza), reflects that Y.M. lost forward momentum and missed an opportunity to develop certain adaptive skills, but it does not reliably demonstrate that she lost a skill set formerly in her command. The missed opportunity described in the excerpt from Dr. Talbot Fox's letter (id. at 9-10) is properly remedied with the standard compensatory education award. The excerpts Plaintiff offers from Dr. Grueneich's findings (id. at 10-11) also describe a

---

[7]         Plaintiff suggests that she is considering a move outside of Maine. (Pl.'s Mem. at 15.) Should she move her family, she is concerned that it "would make it difficult for the District to provide services." (Id.) This potential development is too slender a reed on which to base a compensatory education award. Plaintiff does not describe any actual plan to move. Moreover, depending on the area to which the family might relocate, it might well prove easier to deliver services to Y.M. in a new setting.

loss of momentum or a plateau in development, but not regression.  Finally, even though the highlighted excerpt from Dr. Podraza indicates that he was specifically asked to consider regression (id. at 11-12), he does not report regression in academic performance.  Instead, he offers an opinion that "she will require at least as much time to make up lost educational services as she was deprived of them, however many hours of service the court determines that to be." (Podraza Aff. ¶ 8, Doc. No. 178.)  What Dr. Podraza advocates, however, is additional compensatory education because he believes that Y.M. developed a distrust of adults based on negative school experiences and therefore requires "additional time, of possibly up to a year, to adapt to school routine and to develop trusting relationships with school staff before she will make progress toward her educational goals."  (Id. ¶ 9.)

The distrust of which Dr. Podraza speaks is, ostensibly, based on a bad experience in the Surry Elementary School in May 2006, which followed a bad subjective experience Y.M. had attempting to adapt to a residential placement at the Perkins School for the Blind in 2005. However, there is no reliable evidence that Y.M.'s subjective experience during roughly one week of one-hour per day visits to Surry Elementary in May 2006 could account for a year's worth of regression in terms of trusting adults who work in a school setting.  A reasonable interpretation of the record is that the subjective pain Y.M. experienced during her attempt to adapt to a residential program far from home, which resulted in hospitalization, would have had a far greater impact on Y.M. than a week-long series of one-hour visits to Surry Elementary School in May 2006, which entailed a mere uptick in incidents of self-injurious behavior— incidents that Plaintiff herself has said were overblown by school personnel to make Y.M.'s behavioral issues seem worse than they really were.  As a matter of equity, the potential negative impact of the attempt at a Perkins placement should not be laid at Defendant's door.  The

potential negative impact of the brief period of time at Surry Elementary in 2006 might be, of course, but there is no reliable basis for drawing such a powerful inference as the one advocated by Plaintiff and by Dr. Podraza. The record does not contain evidence or allegations of other negative experiences with school personnel until the eventual placement at Bangor Area High School in 2009, which is beyond the scope of this remedial order.

Ultimately, Plaintiff's argument for a regression enhancement sounds a lot like a compensatory damages or punitive damages enhancement, which is not appropriate. Plaintiff no doubt still feels the sting of a woefully inadequate attempt to reinstitute programming in Y.M.'s home school district at the tail end of the 2005-2006 school year. For her, May 2006 was the start of a long and laborious IDEA battle for which Defendant is responsible and should be penalized. To advance this cause, Plaintiff would have the Court infer that it is Y.M., rather than Plaintiff, who is still struggling to overcome the events of May 2006. The record simply does not bear the weight of this hyperbole. Y.M.'s relative difficulties adapting to school-based programming has a lot to do with breakdowns in adult relationships, but there is no reliable basis to find that Y.M. has internalized a fear of adults who work in a school setting. A far more natural inference is that Plaintiff's parental influence has a substantial impact on Y.M.'s subjective attitude and that Y.M. likely would adapt more readily to new school personnel if Plaintiff supported a transition. For all of the foregoing reasons, I recommend that the Court not enhance its award to account for regression.

D.      **Measuring the Award**

The issue for the Court is how to devise an appropriate remedy for established violations of the Individuals with Disabilities Education Act (IDEA). Both parties request a remedy that will require the Court to measure the duration of the period in which Y.M. went without a proper

23

IEP and placement due to Defendant's IDEA violations. The violations in question span four distinct periods described below.

### 1.  *Period 1*

The first period concerns the tail end of the 2005-2006 school year. This period began on May 8, 2006, Y.M.'s first day back at a Surry Elementary placement following her recovery from a failed attempt at a residential placement at the Perkins School for the Blind, and ended June 21, 2006, the last day of the school year. (Stip. re. Sch. Calendar, Doc. No. 195.) I round this period to be six weeks rather than seven, in light of the Memorial Day holiday.[8]

### 2.  *Period 2*

The second period consists of the extended school year (ESY) program for summer 2006 that United Cerebral Palsy administered rather than Defendant Surry School Department. Plaintiff asserts that this violation amounts to eight weeks. Defendant does not object to the eight-week figure.

### 3.  *Period 3*

The third period consists of the entire 2006-2007 school year. Plaintiff asserts that the school year amounts to 40 weeks. Defendant does not object.

### 4.  *Period 4*

The final period concerns the 2007-2008 school year.[9] Plaintiff contends that Defendant never was prepared to deliver a meaningful program at any point during the 2007-2008 school year. Defendant contends that it was ready and able to do so by November 2007, at the latest,

---

[8]    Plaintiff says this period amounts to 20 weeks of loss. (Pl.'s Mem. at 4 n.5.) It is not clear how she arrives at this number. This recommendation does not suggest that an award be made for the period of time that Y.M. was recuperating from a failed attempt to transition to residential programming. Equitably speaking, this loss was not the fault of Defendant.

[9]    The 2007 summer ESY plan that preceded the 2007-2008 school year was upheld as reasonably calculated to provide meaningful educational benefit in the least restrictive environment.

but offers August 23, 2007, (coinciding with its IEP decision) as the date it believes it could have started delivering a program if Plaintiff had been willing to cooperate with a day treatment placement.

Neither the Recommended Decision on the merits of the case nor the Court's Order Adopting the Recommended Decision resolves whether Defendant was ever ready to supply Y.M. with a meaningful educational program during the school year, but the Recommended Decision left open the possibility that the Court might find a violation for something short of the entire school year. (Rec. Dec. at 43 n. 24.) Plaintiff argues that a remedy should be provided to replace the entire school year. In her view, no reasonable parent, if placed in her position, would have sent a child to a KidsPeace day treatment placement given the lack of meaningful input at IEP Team meetings about that placement and program. She also attests to the fact that the physical structure that was supposed to house Y.M.'s program was never installed at any time in 2007. Defendant's position, on the other hand, is that the Court should not award any compensatory remedy for this period because Plaintiff would not have allowed Y.M. to attend a program at KidsPeace no matter how well prepared it was. In Defendant's view, it is unfair to lay all blame at its door when Plaintiff steadfastly refused to partake of any program other than the one she advocated.

The Court should fashion a compensatory education remedy for the entire school year *unless* the record reliably demonstrates that there was a point in the course of the 2007-2008 school year when an objectively reasonable parent would have allowed her child to enter special education programming in the day treatment setting. For reasons that follow, it was objectively reasonable for Plaintiff to withhold Y.M. from programming as of the start of the school year,

based on the content presented at the IEP team meetings leading up to the start of the school year. It remained objectively reasonable through April 15, 2008.

At the June 21, 2007, team meeting, Dr. Godfrey, a consultant hired by Defendant Surry School Department, stated that KidsPeace would not be a suitable placement. Then, at the August 23, 2007, meeting, it was evident that Dr. Godfrey had fallen from the team and that Surry School Department had nothing of substance to offer at that time to materially change the programming or delivery picture. (See Rec. Dec. at 15-17, 19-20.) Although Defendant decided upon a "day treatment placement" at these meetings, it had not yet supplied enough input concerning program delivery and oversight in a day treatment setting. Defendant was not proposing to place the child in a preexisting private program already designed to serve the child's particular needs. Rather, Defendant proposed a unique program in a private setting that was not already oriented toward the child's needs. In this kind of circumstance, a reasonable parent would expect greater information than what Defendant supplied at the June and August team meetings.

The record used by the Court to determine the merits of the instant case does not neatly divulge how Y.M.'s IEP Team developed her program following the August 23, 2007, meeting. That record leaves a rather strong impression that the result of the DOE's complaint investigation emboldened the Plaintiff while causing Defendant to prioritize litigation over program development for a time. However, this impression is modified by the record the parties developed on the merits of related case 09-cv-411 concerning preparation for the 2008-2009 school year. These materials reflect that the consulting experts on Y.M.'s IEP Team continued to make progress toward meaningful program development. Nevertheless, relevant reports were still coming in as late as November 2007 and program development appears to have stalled out

into February due to the holidays and the demands of the due process hearing associated with case 09-cv-411. (Rec. Dec. in 09-cv-411 at 10-12.) The record does not divulge any appreciable progress on the IEP until March 2008. At that time, what I have referred to as the "behavioral scaffold" was taking shape. (Id. at 12.) As related in the Recommended Decision on the merits of the 2008-2009 school year dispute, it was the emergence of this scaffold, the acceptance of it by a number of consulting experts, and the process of fleshing it out in preparation for the 2008-2009 school year that ultimately righted the apple cart and made Plaintiff's steadfast refusal to support the emerging program and placement less than objectively reasonable.

Given "fairly sophisticated expectations" for teacher training and program implementation (id. at 13), there was not a real prospect of jump-starting this program all at once in April 2008. Dr. Talbot Fox indicated in April 2008 that she felt the Team had a "great starting point" in the behavioral plan, but the problem of finding a "kingpin" for the program remained. (Id. at 14-15.) Counsel for Defendant acknowledged that the picture was still "emerging" at this juncture. (Id. at 15 (citing statements made by Attorney Herlan at an April 2008 team meeting).) However, it was emerging quickly. Staff of KidsPeace was in attendance at the April 9 and 10 meetings. A number of highly-competent experts made very reassuring presentations. Although KidsPeace staff did not present to the group, it was becoming clear what the program would entail and what KidsPeace's defined role would be. It was apparent that Defendant was not proposing to send Y.M. to KidsPeace for "an autism program," but for an individualized program designed to serve her unique needs. Though there were some loose ends, the group also recognized that many of these loose ends could only be tied down *in situ*. They could not all be finalized ahead of time. (Id. at 21.)

Throughout the planning process, it was recognized by all that Y.M.'s reintroduction to special education programming would involve a gradual and potentially protracted transition phase. In my view, a reasonable parent, cognizant of the need for a gradual transition to new staff and appreciative of the programming strides taking place as of the April IEP Team meetings, would have stopped resisting a KidsPeace placement and would have collaborated fully as of April 15, 2008, to ensure that the transition back to school would coincide as much as possible with the remaining logistical details of bringing in a structure to serve as a dedicated classroom and bringing the consulting service providers into final alignment. For this reason, I recommend that the Court award compensatory education for the violation associated with the 2007-2008 school year for a period of less than a full school year. With a start date of August 30, 2007 (the start of the school year), and an end date of April 15, 2008, this period amounts to 32 weeks.[10]

     *5.*     *The sum*

Together, the four periods in question demonstrate a deprivation of 86 weeks. The Court should order compensatory educational services for an equal amount of time, to be provided by means of an extension of Y.M.'s special education eligibility.

**E.**     **Extension of Eligibility**

The parties agree that compensatory educational services for Y.M. cannot be provided on top of, or in conjunction with, the educational services she should receive during her remaining years of special education eligibility. The record certainly supports this view. Consequently, the Court should order that compensatory educational services be supplied in later years through an

---

[10]     This figure is based on 40 weeks for the total school year, minus the eight weeks between April 15, 2008, and June 19, 2008, the last day of the school year (not including the week of April vacation). (Stip. re. Sch. Calendar, Doc. No. 195.) I have attempted to round to the nearest week rather than compute a precise number of school days, as the parties' presentations are not designed to compute an exact number of days.

extension of Y.M.'s eligibility. Such an extension is common with compensatory education equitable awards, notwithstanding the fact that the IDEA limits eligibility to disabled children between the ages of 3 and 21. Pihl, 9 F.3d at 189.

Although it is common for courts to remand the issue of remedy to an "appropriate administrative body," Bd. of Educ. of Fayette County v. L.M., 478 F.3d at 318, both parties propose that the Court resolve the issue of the duration or value of a compensatory education award at this time. This request is appropriate in this case, as a remand would likely result in further due-process proceedings,[11] which might well result in further judicial proceedings. The parties already have litigated sufficiently to determine the compensatory education award.

For reasons set forth above, it is recommended that the Court issue its remedy in the form of an award of 86 weeks of compensatory education services, subject to the dictates of the IDEA with respect to ongoing IEP development and placement decisions. The remedy should overlap with (rather than run consecutive to) the remedy ordered by the Maine Department of Education pursuant to the complaint investigation report of July 2007.

Because the proposed remedy has a term that roughly corresponds to two ordinary school years, the parties will have to address the issue of extended school year (ESY) services on more than one occasion, if a school placement is ordered. In the past, Y.M.'s IEP Team has found that ESY services are appropriate. Should this continue to be the case, the ESY programming should be counted toward satisfaction of the total compensatory education award even though ESY programming could be less intensive than ordinary school-year programming.

---

[11]    As the Court may recall, it had some concern about the way in which the assigned hearing officer handled administrative proceedings below. Plaintiff also alleged bias in her complaint. A remand would require some further attention to this matter.

**F.     Other Relief**

Plaintiff has also requested a monetary award to offset certain costs she assumed for Y.M.'s educational development. Plaintiff has not demonstrated an entitlement to such a recovery as she has not demonstrated that these costs provided Y.M. with an IEP that provided a free appropriate public education equivalent in the home setting. Plaintiff also requests litigation costs. She has submitted a collection of receipts to support this request. The Court should award costs and direct Plaintiff to resubmit her receipts in conjunction with a bill of costs pursuant to Local Rule 54.3. This aspect of the costs request should be administered by the Clerk's Office.

Finally, Plaintiff requests that she receive a monetary award in the nature of an hourly fee or salary for the efforts she undertook to mitigate the loss caused by Defendant's violations. The Court should deny this request. An award of the costs of alternative programming is ordinarily limited to circumstances in which the alternate program amounts to an "appropriate" education, as in one that supplies an appropriate IEP. Carter, 510 U.S. at 15. Plaintiff does not suggest that her attempt to coordinate services from the home has supplied Y.M. with an adequate IEP. Nor has Plaintiff provided an accounting suggesting any purchase of services on the open market. It appears, instead, that other funding mechanisms have supported interim services. As the Court knows, Y.M. received day habilitation services for a considerable amount of time from UCP, both during the school year and during the summer. Plaintiff was not Y.M.'s full-time special education teacher, though Y.M. no-doubt benefited from Plaintiff's special education training and experience. Although Plaintiff alludes to an opportunity cost in terms of other employment, she has not offered evidence of foregone work opportunities, even assuming that an equitable award would be available under the IDEA for such a loss. Although the record contains evidence that Plaintiff is self-employed making wreaths in the holiday season, it does not reveal

Plaintiff's employment history or provide reliable evidence that she would have pursued any other occupation in the relevant timeframe, beyond seeing to the needs of her adoptive children.

## CONCLUSION

For reasons set forth above, Defendant's Motion to Exclude (Doc. No. 167) is granted in part and denied in part.  As for the issue of remedy, I RECOMMEND that the Court order 86 weeks of compensatory educational services, to be provided by Defendant upon the expiration of Y.M.'s existing period of eligibility, unless the Department of Education directs that a substitute decision maker with expertise will fulfill Defendant's IDEA obligations.


NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

March 24, 2011